[Civ. No. 3542. Third Appellate District.—June 21, 1928.]

IVA B. LEWIS, Respondent, v. SOUTHERN CALIFOR-
NIA GAS COMPANY (a Corporation), Appellant.

Thos. J. Reynolds for Appellant.

Duke Stone for Respondent.

PLUMMER, J.—Plaintiff had judgment in the sum of
$1,500, damages alleged to have resulted from an explosion
of gas occurring while the plaintiff was using the oven of a
gas stove in an apartment occupied by her. From this judg-
ment the defendant appeals.

The transcript shows that on or about the tenth
day of September, 1924, the plaintiff called at the office of
the defendant and made application for gas service in apart-
ment number 5 at number 417 West Twenty-eighth Street,

in the city of Los Angeles. In response to said request an employee of the defendant, on the afternoon of said day, went to the apartment house referred to and turned on the gas at the meter belonging to the defendant, and also went in the apartment and tested one or two of the top burners of the stove to see that the gas was coming through the pipes. Thereafter, and prior to the twenty-seventh day of October, 1924, the plaintiff twice used the oven of the stove referred to. The stove was an "Occidental" cooking range, installed in apartment number 5 by persons other than the defendant. The defendant had nothing to do with installing the service pipes leading from the meter to the gas range in apartment 5, and, as just stated, had nothing to do with the sale or installation of the cooking range. On the morning of the 27th of October, 1924, the plaintiff lighted the gas in the oven of the cooking range, left the door of the oven open for a few minutes, and proceeded with other duties in which she was engaged. After the gas had been lighted for a few minutes, the plaintiff closed the door and resumed the performance of other duties in and about the apartment. In a short time the plaintiff returned to the gas range, opened the oven door and the burning gas flashed out and caused the injuries upon which the action against the defendant was based.

The testimony is uncontradicted that neither the plaintiff nor the owner of the apartment house in which the plaintiff was occupying an apartment, ever requested the defendant to make any adjustment or test of the gas range in question, or of any of its appliances. After the explosion, a representative of the defendant named Andrews went to the apartment house, made an investigation of the cause of the flaring up or explosion of the gas, and came to the conclusion that when the door of the oven was closed, sufficient air could not be admitted to the burner to enable the gas to burn properly, this defect being due, in the opinion of the witness, to the fact that the air-mixer was not sufficiently adjusted to admit of sufficient air to cause the flame to burn properly. This witness was further of the opinion that the adjustment had become defective by reason of the accumulation of rust, corrosion, and dust or dirt which impeded the flow of air through the air-mixer. The testimony of this witness was further to the effect that whenever an

employee of the defendant goes out to turn on the gas in any apartment, or to install a meter, the employee usually enters the apartment and turns on one or two of the top burners to see that the gas is coming through, and that the company never makes any attempt to adjust or inspect ranges, but merely turns on one or two of the convenient burners for the purpose of seeing that the air is all out of the pipes. There was also testimony to the effect that the vent-pipe, which is used for carrying away fumes from the oven, was disconnected, and the testimony is also to the effect that this had nothing to do with the cause of the explosion, and that the vent-pipes were not attached or used in connection with ''Occidental'' gas ranges in the apartment house in which the particular one in question was installed. The theory upon which the trial court rendered judgment for the plaintiff appears to have been that it was the duty of the defendant to inspect the gas range and adjust the air-mixers or appliances thereon. This appears from the remarks of the court taken during the introduction of testimony, to wit: ''Q. Did you, at any time, ask the Southern California Gas Company to adjust this particular 'Occidental' range for you prior to October 27, 1924? A. I did not. The Court: Having paid for the gas, was it up to her to notify them to adjust it? . . . I am asking you, having paid for the gas, was it up to her to notify them to adjust it? Mr. Reynolds: To adjust the stove? The Court: Yes. Mr. Reynolds: If she knew that it was out of order, I think it was up to her. The Court: Well, the court is not agreeing with you.'' The plaintiff had testified that the second time she lighted the oven, it burned only with a red flame, and not with a blue flame, which she did not think was right; that she had not seen it burn with a red flame before. The respondent's contention is further to the effect that the defendant had established a custom of inspecting gas stoves after turning on the gas or installing meters, and calls our attention to the following testimony introduced in support thereof: ''Mrs. Ida Gray Scott, the proprietress of the apartment house, which contained many rooms, among other things testified: Q. Do you know of your own knowledge whether or not the Southern California Gas Company ever inspected this particular range in apartment five? A. They did when they turned the gas on. Q. Did you see them

inspect it? A. I cannot remember that; I know they always did. Some one of us in the family did see it, but which one of us I cannot remember. Q. But you did not see it? A. I cannot remember; maybe I did; I know it is always done. Q. By Mr. Stone: You know you placed your order with them and the inspection was made, and you did not place your order with anyone else? A. No, I did not place it with anyone else. Q. By Mr. Reynolds: Did you ever ask the Southern California Gas Company to inspect the various ranges in your house? A. I don't think I ever did. Q. By Mr. Stone: Mrs. Scott, when they turned the gas on there, you do know that someone from that company inspected it at the time they turned it on? A. They did at the time they turned it on; they inspected the stove. Q. By Mr. Reynolds: Did you know of your own knowledge or did you see any representative of the Southern California Gas Company inspect this particular 'Occidental' gas range in apartment 5 at the time the gas was turned on for Miss Lewis? A. I cannot remember which one of us went with the man to open the door and let him in and saw him do it. I cannot remember. There is three of us together. Q. You do not remember of seeing any man from the Southern California Gas Company adjust that stove? A. No, but they always do. . . . Q. By Mr. Stone: As owner of the apartment house, you had no dealings with anybody but the Southern California Gas Company concerning gas in that apartment? A. No. Q. By Mr. Reynolds: Did you ever request the Southern California Gas Company to inspect your ranges in your apartment house? A. I don't think I ever did. They always did it at the time they turned on the gas.'' This testimony, however, does not support any such contention. It simply shows that the witness thought such was the case; that she never saw them inspecting the stove; never asked them to inspect the stove. The only reasonable explanation of the witness' testimony, and the only reasonable conclusion that can be drawn therefrom, is that the witness knew that after a meter was installed or gas turned on by the company, that the employee of defendant who turned on the gas or installed the meter went into the apartment to which gas had been turned, and lighted a burner or two to see if the gas was coming through, or, as stated by one of the witnesses, to ''bleed the air out of the

pipes." There is nothing whatever in the record to the effect that anyone ever saw any of the employees of the defendant making adjustments of the air-mixers or air-valves, or doing anything whatever to make certain that the proper quantity of air was being admitted to the burners in order to insure proper combustion. The only testimony in the record showing the acts performed by the employees of the company is to the effect, as we have stated, that after turning on the gas, a burner or two was lighted to make sure that gas was coming through the pipes. The testimony as to whether the improper condition of the air-vents leading to the burner in the oven of the gas range could have been ascertained by proper inspection, is wholly irrelevant to any of the issues in this case. If the defendant had no duty to perform in relation thereto, the inquiry is ended.

The statement in the respondent's brief that the plaintiff did not discover anything wrong with the stove between September 10th and October 27th, is not borne out by the testimony. As we have just stated, the plaintiff testified that the second time she lighted the oven, it burned with a red flame, which she did not think was right. The respondent then further states in her brief that the defect which caused the explosion could have been discovered if the person turning on the gas in the usual way had made the ordinary inspection. The testimony, however, is directly to the contrary. We here give the following excerpt from the testimony, in answer to respondent's counsel: "Q. All of which would have been discovered by the man when he went to turn on the gas and did what was the custom of the Company for years to do? A. No. Q. It would not have been discovered? A. No. Q. Are you positive of that? A. Absolutely. Q. Now, you have given perhaps two or three reasons why this explosion occurred. Will you please state whether or not with the usual inspection that it has been the custom of the company to make when turning on gas, the trouble would not have been disclosed that existed then in such a way to cause the explosion? Wouldn't the man have found it out when he lit this stove? A. No." This is followed by the further statement in respondent's brief, to wit: "And the same employee further testified that if the usual and customary practice had been followed, that this lack of

the proper connection for the lighting of the stove would have been discovered by the employee.'' The testimony upon which this statement is based relates to the vent by which the fumes are carried away, and not to the adjustment of the air-mixer by which the flame is fed with oxygen. This appears when we quote the testimony which eliminates some apparent confusion, to wit:

''Q. Was there any ventilation for this oven? A. It was not connected. There was a place for ventilation to be connected to it? Q. But the ventilation had not been connected with the oven? A. No. Q. Now, if that were true on the 10th day of September, when your man went out there and turned on the gas, if he had turned it on and lit it, as he said it was the universal custom to do, he would have seen that, would he not? A. If he had lighted it, yes. Q. If he had followed the universal custom of turning on the gas and lighting this stove, he would have discovered that there was no vent connected with it? A. Yes. Q. You have testified that the flue where the odors from the oven pass off was not connected? A. It was not. Q. Is it customary for flues of that nature to be connected? A. It is not customary only in a very few places in Los Angeles. Q. In other words, by casual inspection it would show that this flue was not connected, and that is customary in Los Angeles? A. Yes, sir. Q. If this flue had been connected with the vent, would that have had anything to do, one way or the other, with this particular explosion? A. I don't think it would.'' The testimony further shows that the particular stove in question had been in use for something like one year previous to the explosion. There is no testimony showing that the vent was ever connected, nor is there any testimony in the record showing that the gas company ever installed or connected vents with gas ranges. The testimony further is to the effect that mechanically the air mixture appeared to be all right, but that the fault was in the adjustment, and that the red flame which the plaintiff testified to, was the result of defective adjustment. It does not appear that either the plaintiff or the proprietress of the apartment house gave any directions to the defendant or to anybody else in relation to the adjustment of the gas range, or did anything further than to request that the gas be turned on. There is also testimony to the

effect that the defendant did not adjust appliances for gas stoves unless they had an order for that purpose. We find nothing in the record indicating that it was the custom of the defendant either to make adjustments or inspection of adjustments of gas ranges, other than the intimations contained in the language used by respondent's counsel in propounding questions on cross-examination.

As stated herein, the defendant owned the pipe-lines and gas fixtures from the street up to and including the gas meter. From there on the defendant had no ownership whatever. The ownership and control of the defendant stopped with the meter. The ownership and control of pipe-lines and fixtures, including stoves, vested in the proprietress of the apartment house and her tenants. Whether the defendant, by inspection, could have discovered a defect in the adjustment of the gas mixture admitting air to the burner in the oven of the gas range, does not carry with it any liability, unless it was the duty of the defendant to make such inspection and discovery.

Under the circumstances disclosed by the record in this case is there any liability on the part of the appellant? The general rule in cases like this is aptly stated in 29 California Jurisprudence, page 594, section 59d: "The general rule requiring the use of ordinary care and diligence on the part of a gas company applies to its delivery of gas into the residence or other building of the consumer. The rule has been laid down, however, that in the absence of any fact upon which to base an inference of duty, the failure of the gas company, on introducing gas into a dwelling, upon application, to inspect pipes or fixtures which were placed there by the owner, and over which the company had no control, is not negligence. The company is warranted in assuming that the interior system of pipes is sufficiently secure to permit the gas to be introduced with safety. To render the company liable in such cases, there must be facts alleged to show notice of defects, or facts from which an inference of duty to inspect arises, either from contract, custom or franchise." Cases are then cited where gas companies have been held liable when given notice of a defect or leak in the gas system, in not immediately turning off the gas, etc., which cases are not pertinent here. In the case of *Okmulgee Gas Co.* v. *Kelly,* 105 Okl. 189 [232

Pac. 428], the supreme court of Oklahoma considers questions identical with those presented here as to liability, and sets forth the law in a carefully prepared opinion, and we can do no better than quote therefrom: ''The gas company owes the duty to see that the pipe lines and fittings, when first laid in the ground, with reasonable care and skill, will not permit the escape of gas, and a system of inspection is required as will result in reasonable promptness in the discovery of leaks, which may occur from deterioration of the material, or from other causes within contemplation by the company. (*Pine Bluff Water Co.* v. *Schneider*, 62 Ark. 109 [33 L. R. A. 366, 34 S. W. 547]; *Louisville Gas Co.* v. *Guelat*, 150 Ky. 583 [42 L. R. A. (N. S.) 703, 150 S. W. 656]; *Barrickman* v. *Marion Oil Co.*, 45 W. Va. 634 [44 L. R. A. 92, 32 S. E. 327].) But in this case the duty rested with the defendant, only to maintain inspection and make repairs over its lines, which ended at the property line of the consumer. The defendant owed no duty to inspect the pipe-line and gas fittings of Agard. The defendant would not be liable for injury resulting from explosions, due to defects of pipe-line, gas connections, and fittings on the property of Agard, unless it had actual notice of such defects. (See notes to 32 L. R. A. (N. S.) 813; L. R. A. 1915E, 1023; Ann. Cas. 1914C, at page 348.) If the gas pipes and fittings are the property of the consumer, and there is no contractual duty resting on the gas company to inspect, the consumer, by application for gas service, assumes the burden of inspecting and maintaining the pipe and fittings on his property in a manner reasonably suited to meet the required service, and the company has the right to assume that these duties have been performed by the applicant. (*Smith* v. *Pawtucket Gas Co.*, 24 R. I. 292 [96 Am. St. Rep. 713, 52 Atl. 1078].) However, the company would be responsible for inspection and the condition of the meter and its connections which it installed on the premises of the consumer.'' To the same effect we may cite 12 R. C. L. 909, where it is said: ''Generally speaking, a gas company which does not install the pipes in a customer's building, and which has no control over them, is in no way responsible for the condition in which they are maintained, and consequently, is not liable for injuries caused by a leak therein, of which it has no knowledge.

One who applies for gas has the duty to see that his own pipes, through which the gas it to be used, are in good order, and no general obligation on the part of the company can be inferred to inspect such pipes.'' See, also, note, Ann. Cas. 1914C, p. 348, holding that a gas company owes a duty only to inspect that portion of the gas line and fixtures which it owns and controls. The authorities relied upon by the respondent refer only to cases where gas companies have been liable on account of negligence in not turning off gas after notification that the pipe-lines were leaking. That a gas company is not liable for defects upon the owner's premises, see, also, note in 25 A. L. R., p. 272. That the proprietress of the apartment house might have been liable under the law as laid down in *Gobrecht* v. *Beckwith*, 82 N. H. 415 [52 A. L. R. 858, 135 Atl. 20], and the annotations appended to that case, does not fix any liability upon the defendant. Nor does the rule of *res ipsa loquitur* apply. That rule applies only when the appliance and fixtures involved all belong to the gas company. A good case showing when this rule applies is that of *Chiles* v. *Ft. Smith Commission Co.*, 139 Ark. 489 [8 A. L. R. 493, 216 S. W. 11], and the annotations appended to that case. See, also, *Triplett* v. *Alabama Power Co.*, 213 Ala. 190 [104 South. at page 248]. That the defendant is not liable for defects in fixtures which it did not install is likewise held in *Helm* v. *Manufacturer's Light & Heat Co.*, 86 W. Va. 628 [25 A. L. R. 240, 104 S. E. 59]. There, as here, the trouble arose from a defect in appliances not installed by, and not under the control of the defendant. Other cases might be cited, but the holding of all of them is to the effect that liability does not extend beyond the property owned and controlled by the defendant unless some defect has been discovered of which the gas company has notice, requiring the company to discontinue its service until the defect is remedied, and it fails so to do. There is also inserted in the record the rule of the Railroad Commission setting forth that the owner of the premises into which the gas is conducted is liable for all defects from the point where the gas meter connects with the service pipes upon the premises in question. Whether this rule applies to the instant case need not be decided, and whether such a rule would excuse the defendant from negligence need not be determined, as

we find nothing in the record upon which a conclusion could be predicated that the defendant has been guilty of the violation of any duty incumbent upon it.

The judgment of the trial court is reversed.

Finch, P. J., and Hart, J., concurred.