144 So. 822 ·

## ALABAMA UTILITIES SERVICE CO. v. HAMMOND.

### 3 Div. 997.

Supreme Court of Alabama.

Nov. 10, 1932.

Rehearing Denied Dec. 22, 1932.

---

658

Ball & Ball and Steiner, Crum & Weil, all of Montgomery, for appellant.

Hill, Hill, Whiting, Thomas & Rives, of Montgomery, for appellee.

BOULDIN, J.

The action is under the homicide statute, Code, § 5695, a suit by the parent to recover damages for the death of his minor son caused by the alleged wrongful act or negligence of defendant.

Among the questions presented for review, appellant strongly insists it was due the affirmative charge.

Count A of the complaint, the sole count on which the case was submitted to the jury, avers:

"* * * That on to-wit: October 22nd, 1930, plaintiff was in possession of a certain apartment in the building in the City of Montgomery, Alabama, located at or near the Northeast corner of Caroline and Mildred Streets, which apartment he then occupied as his home. That there was then in said apartment an appliance or apparatus known as an instantaneous water heater for the purpose of heating water by the use of gas, said water when so heated was used for domestic purposes in said apartment. That the defendant at that time was engaged in the City of Montgomery, Alabama, in the business of furnishing for a reward gas to the public generally, and then and there undertook in the prosecution of its said business to furnish for a reward natural gas to said apartment, to be used in said heater, and undertook to adjust said heater for the use of said natural gas therein, and did said adjusting in so careless and negligent a manner that as the proximate result and consequence thereof on to-wit: October 27th, 1930, while plaintiff was in possession of said apartment, as aforesaid, and while natural gas furnished by the defendant was burning in said heater, poisonous and dangerous gasses were emitted in such apartment from said heater or its connections, to such an extent that plaintiff's minor son, James B. Hammond, who was then and there in said apartment, was overcome and killed by said poisonous and dangerous gasses."

Evidence tended to show plaintiff's minor son came to his death from carbon monoxide poisoning, and that such poisonous gas was generated in and passed into the atmosphere of the room, a closed kitchen, from a hot water gas heater of the vulcan type.

Defendant company had been supplying its customers in Montgomery with artificial or manufactured gas, and was introducing instead natural gas.

On October 4th an advertisement or notice and warning was published through the press, headed: "Natural Gas is Here."

We quote certain pertinent excerpts:

"Read the Red Card—

"A red card, on which is printed complete instructions, has been mailed to every customer in this district. Please follow these instructions exactly. * * *

"We will make Adjustments—

"Early Monday morning, a large force of expert workmen will begin on a pre-arranged schedule to adjust every customer's appliance. This schedule is designed to complete the job as quickly, and with as little inconvenience to everyone as possible. Please do not ask us to vary from it, since to do so would cause endless confusion, and delay the completion of the adjustments, inconveniencing everyone.

"Ranges and water heaters will first be adjusted all over the city. * * *

"The same heat—Less Gas—

"The adjustment which will be made to your ranges, water heaters and other equipment is designed to give you just the same amount of heat that you now have in these appliances—if they are now properly adjusted.

"Although Natural Gas contains about twice as much heat as manufactured gas, only about half as much gas will be used— the lesser amount of gas necessary to do the same amount of work will mean the saving to you.

"Natural Gas burns with a 'lazy' flame. It will not 'look' as hot, but it will be.

"When it reaches your Home—

"You will be able to tell when natural gas reaches you. The burners on your gas range, normally burning about an inch high, will become much higher, the flame much larger and hotter, just as if the pressure had been greatly increased. The pressure will be the same—however, the difference being in the quality of the two fuels.

"When this occurs, you will find it easy to turn down the top burners on your gas range, and continue to use them. We advise you, however, to turn off completely all other appliances, including the oven on your gas range, and not to use them again until we can adjust them to use the new, and much richer fuel."

Plaintiff was not a customer at that time, having recently moved into the apartment. The gas water heater in the apartment had been installed several years before by the owner, and used by former tenants.

Plaintiff, or Mrs. Hammond, having made application for gas service, defendant, to quote from its answers to statutory interrogatories, first sent its agent, Morgan, "with an order to set a meter and turn on gas for Mrs. Roy Hammond to run gas into the pipes already in the house. The meter was set, gas turned on at the meter and the water heater connected to the gas pipe was lit to determine that gas was flowing through the meter and pipes. As the water heater had not been converted from manufactured to natural gas, a tag was placed on the heater warning the customer not to use it until our conversion men had converted the heater for use with natural gas. The gas valve at the meter was then turned off. * * * The tag was made of cardboard and had printed in red thereon 'Caution—Do not use this appliance until it has been adjusted or converted for Natural Gas.' The tag was removed by C. H. Cobb after the burner had been adjusted to use natural gas."

Other evidence tended to show plaintiff said to the adjuster: "Look it over good and if there is anything wrong with it, boys, don't cut it in, because I haven't got to have it now." And Mrs. Hammond testified: "* * * Two men came out and adjusted the heater and pulled the tag off and told me that they had adjusted it. I asked him if they were sure the heater was all right and they said it was perfectly all right."

Without dispute carbon monoxide, a poisonous gas, is produced by incomplete combustion of natural gas as well as artificial gas.

Hot water heaters of the kind here involved are equipped with burners to produce a nonluminous blue flame. To this end the gas first passes from the pipe line through an "orifice" into a small chamber where it is mixed with a proper proportion of air known as "primary air." This mixture passes out through ports where it is ignited, and, with further air admitted direct to the flame known as "secondary air," complete combustion is effected. A deficiency of oxygen for want of sufficient air supply, either primary or secondary, is a major cause of incomplete combustion, and consequent production of carbon monoxide and one or more other disagreeable gasses.

The evidence discloses that natural gas has approximately twice the number of heat units of a like volume of the artificial gas theretofore in use; that, to adjust burners theretofore using artificial gas so as to get the same heat from natural gas, one-half the volume of natural gas is required. Such adjustment, defendant's evidence tends to show, is accomplished by lessening the size of the "orifice" so as to permit the passage of approximately one-half the quantum of gas as theretofore. This to be accomplished by inserting a small adapter designed for the purpose, to be reamed out until the proper size. This done, defendant's evidence further tends

to show the quantum of primary and secondary air need not be adjusted. The test of a proper adjustment, appellant insists, is the production of the typical nonluminous blue flame, without yellow tips, which latter indicates carbon monoxide formation.

Defendant's employee making the adjustment, as well as others who made subsequent tests, testifies that such an adjustment was made. No witness directly contradicts these witnesses as to the appearance of the flame.

But, if such a flame means complete combustion and no monoxide formation in the appliance, the evidence of plaintiff tending to show that, by actual test under the same conditions, carbon monoxide in dangerous quantities was produced and escaped into the room, and the actual death of plaintiff's son from the presence of carbon monoxide in the room, with evidence negativing any other source, tended to contradict defendant's evidence as to the condition of the flame.

Moreover, the evidence is not without conflict that the blue flame shows a proper adjustment. Mr. Evans, witness for defendant, qualifying as a combustion engineer with practical experience with gas appliances, testified: "You would get a blue flame on that type of burner even if you had too big a hole unless you had it entirely out of proportion before you put the adapter in and you would get a blue flame on the Vulcan type burner if it was entirely out of adjustment."

It appears this was an unusual type of heater, somewhat obsolete, but other evidence discloses it is in frequent and successful operation elsewhere. There was some evidence that this heater had given trouble of like kind when formerly in use with artificial gas, a fact not known to either of these parties at the time. Other evidence tended to show an appliance of this kind should not be operated without a vent pipe. A city ordinance required the vent pipe to connect with a flue. Such a vent pipe was installed with this heater, but defendant's evidence tends to show it was obstructed or choked so as to prevent proper venting of the products of combustion, that this would contribute to the making of carbon monoxide. Plaintiff's evidence controverted any such obstruction.

There was evidence of an opening where the vent pipe fitted on the collar of the appliance, and of a hole at the point of entrance of the pipe into the flue.

Other evidence tended to show the openings mentioned would not contribute to the formation or escape of poisonous gas.

Other expert evidence for plaintiff attributed the trouble to failure to adjust the shutter regulating the admission of primary air, and consequent lack of sufficient air to complete the combustion.

Another line of testimony tended to show that the flame coming in contact with the cold water container (in this case a globe next to the flame, and two others ranged above it) causes, when first lighted, some carbon monoxide in all such heaters, though properly adjusted. Still other evidence tended to show that, if the flame was too high, causing the inner cone of the blue flame to impinge upon the water globe to which heat was applied, incomplete combustion and consequent carbon monoxide would result. Finally, we note plaintiff's evidence tends to show the formation of carbon monoxide, and the passage of same into the room in dangerous quantities because of excess inside pressure due to maladjustment.

We have detailed, probably at unnecessary length, the various tendencies of the evidence with a view to a consideration of the legal principles involved.

■ The undertaking to "make adjustments" of appliances, done in the promotion of the business of the public utility, called for the same degree of care required of public utilities generally in their services of the public.

■ This degree of care may be defined to be the same degree of care and vigilance which persons of skill and prudence observe under like conditions. Dealing with matters requiring expert knowledge in that line of business implies a duty to have such knowledge and the obligation to act in the light of such knowledge. If there be elements of danger not of common knowledge, this fact must be regarded in providing against such danger. In matters involving the safety of human life, such care and vigilance must be exercised as a due regard for the sacredness of human life demands. 28 C. J. 591.

The main issue in argument seems to be what was meant by the undertaking to "make adjustments" under the facts of the case.

■ Appellant conceives its sole duty was to so convert the burner as to admit a quantum of natural gas of equal heating power as the artificial gas theretofore admitted, the air being already adjusted thereto, as determined by a simple test, the production of a typical blue flame; that there was no duty to inspect the heater and its installation for defects, being under no duty to repair or remedy such defects.

As before shown, a jury question was presented touching the performance of the duty thus defined.

It is obvious from the evidence that the turning in of natural gas on appliances adjusted for artificial gas would entail two results: (1) A waste of gas for want of proper combustion, a failure to utilize the heat-

ing power; (2) the formation of poisonous and dangerous gasses.

In issuing the public warning, and in placing the warning card in this instance, the defendant was performing an obvious duty to avoid these results likely to ensue to those not presumed to have special knowledge of the danger involved.

■ It seems clear that the adjustment undertaken was to avoid such consequences; that, when the adjustment was made and the warning card removed, this was an invitation to proceed to operate the appliance as it stood, such an assurance as would naturally silence further inquiry touching the fitness of the appliance for present use. In this connection the personal warning given by Mr. Morgan, and the later statement of the adjuster, Mr. Cobb, that the heater was perfectly all right, and his statement that he would not cut it in unless it was all right, were within the line and scope of their employment. No other person was to be sent to advise plaintiff when the adjustment had been completed.

That defendant assumed no obligation to repair defects in the heater or its installation is not of consequence. If no proper adjustment could be made because of such defects, none should have been made and announced inviting the immediate use of the appliance. It cannot be said as matter of law defendant was under no duty to test the appliance and to see that no poisonous gas was being formed and passed into the atmosphere of the room in dangerous quantities.

This in no sense is intended to declare the gas company an insurer of the safety of appliances in making adjustments. The question is one of reasonable care in making the adjustments under the circumstances of this case. It is purely a question of negligence vel non, which was a question for the jury.

The case of Triplett v. Alabama Power Co., 213 Ala. 190, 104 So. 248, relied upon by appellant, is not authority for its position, but rather the contrary. In that case the sole undertaking was to make connections between the gas company's service pipe and the owner's receiving pipe connecting with the heater, to see that there was a proper flow of gas. The decision is based on the fact, found by the court as upon undisputed evidence, that defendant did not undertake to inspect the appliance or to make adjustments as in this case.

There was no error in refusing the affirmative charge to defendant, nor in overruling the motion for a new trial upon the ground that the verdict for plaintiff was opposed to the great weight of the evidence.

■ Contributory negligence on the part of the parent, suing in this form of action, is a good defense. Alabama Great Southern Railroad Co. v. Dobbs, 101 Ala. 219, 12 So. 770; Alabama Power Co. v. Stogner, 208 Ala. 666, 95 So. 151.

■ Special pleas A and B (which appear in the report of the case), to which demurrers were sustained, were defective in failing to allege knowledge on the part of plaintiff that the sudden illness of Mrs. Hammond therein averred was due to poisonous gasses being emitted from the gas heater, or facts from which plaintiff knew and appreciated the danger from continued operation of the heater. Mackintosh Co. v. Wells, 218 Ala. 260, 118 So. 276; Mobile Light & R. R. Co. v. Forcheimer, 221 Ala. 139, 127 So. 825; Montevallo Mining Co. v. Little, 208 Ala. 131, 93 So. 873.

■ During the qualification of George J. Fertig, as an expert witness for plaintiff, he was asked: "What position of honor do you hold with reference to your profession?" Defendant interposed a general objection, which was overruled, and defendant excepted. Witness answered: "At the present time I am president of the Alabama Section of the American Chemical Society and president of the Alabama Academy of Science." The witness further proceeded to give his education and experience as a chemical engineer. We find no error to reverse in the above ruling. The standing of an author as recognized authority, when offering his written works in evidence, is properly inquired into. For like reasons, we think, light upon the professional standing of the witness may be shown in the manner here employed.

The right of amendment by striking out all counts of the complaint except count A is recognized by statute. If any evidence had been introduced, admissible only under the stricken counts, it is not pointed out in argument; but, in such case, a motion to exclude the same should have been interposed.

The court's oral charge, taken as a whole, properly defined negligence in such cases.

■ What we have written suffices to indicate there was no reversible error in the written charge given at the instance of plaintiff, assignment of error 25, nor in refusing charges to defendant made the basis of assignments of error 29, 30, 31, and 32.

■ We have carefully considered all questions presented, and find no good cause for reversal upon any ground other than excessiveness of verdict. The court has carefully considered this latter question, presented by motion for a new trial in the trial court, assigned as error, and fully argued by counsel in this court. Mindful of the oft-stated rules of review in such cases, the court

is of opinion, in the light of the entire record, the verdict is excessive to the amount of $7,000. The judgment will stand reversed, and the cause remanded, unless the appellee shall, within thirty days after this date, file a remittitur pursuant to Code, § 6150, reducing the judgment from $25,000 to $18,000. Let notice issue to appellee accordingly. If the appellee shall file such remittitur, the judgment will be reduced and affirmed for the sum of $18,000. Appellee will be taxed with the costs· of the appeal.

Reversed and remanded conditionally.

ANDERSON, C. J., and GARDNER and FOSTER, JJ., concur.