[Civ. No. 9225. First Appellate District, Division One.—December 26, 1934.]

JOHN A. RAY et al., Respondents, v. PACIFIC GAS AND ELECTRIC COMPANY (a Corporation), Appellant.

ALMA L. RAY et al., Respondents, v. PACIFIC GAS AND ELECTRIC COMPANY (a Corporation), Appellant.

330

Thos. J. Straub, W. H. Spaulding and Clinton F. Stanley for Appellant.

Geo. K. Ford and Fletcher A. Cutler for Respondents.

THE COURT.—The plaintiffs, who are brother and sister, brought two actions against the defendant for the recovery of damages, one for the death of their father John A. Ray, and the other for the death of their mother Alma S. Ray, who died as the result of inhaling poisonous fumes from a gas heater which, the plaintiffs charged, the defendant had negligently failed to adjust for the safe burning of the gas supplied by it to its consumers. One W. Chalmers and Pacific Coast Automobile Association were joined as defendants, but these were not served with process, and the cases—which were consolidated for trial—proceeded against the Pacific Gas and Electric Company only. The trial was had before a jury, which brought in a verdict in each case for the sum of $12,500. Two judgments were accordingly entered, each in that amount, and defendant has appealed therefrom and from the order of the trial court made in

each case denying its motion for judgment in its favor notwithstanding the verdict.

As grounds for these appeals it is contended, first, that the plaintiffs introduced no proof of negligence on the part of defendant, especially of the specific negligence upon which their complaint is based; second, that John A. Ray and Alma S. Ray, the deceased persons, were guilty of contributory negligence; third, that the judgments are excessive, and also that the trial court erred in certain of its instructions to the jury.

It is alleged in the complaint that "prior to the 6th day of July, 1930, defendant Pacific Gas and Electric Company, a corporation, issued its certain printed notice to the defendant Pacific Coast Automobile Association, which in substance stated that said defendant Pacific Gas and Electric Company had at said time of issuing said notice changed the quality and nature of the said gas which it had prior thereto been furnishing to its customers in the city and county of San Francisco, state of California, and to the said premises at 670 Turk street, and that by reason of said change it was and would be necessary and essential to change and adjust the mechanism of the heaters and heating apparatus then and there on said premises at 670 Turk street, and that said company would send one of its trained employees to make said inspection and adjustment. That subsequent to the issuance and service of said notice and prior to the said 6th day of July, 1930, said defendant Pacific Gas and Electric Company, its servants and agents, did call at and visit the said premises at 670 Turk street to make said adjustments and inspection of said heating apparatus on said premises, and carelessly and negligently failed and neglected to properly or at all inspect or adjust said heating apparatus, all of which was known to defendants Pacific Coast Automobile Association and W. Chalmers, and that said defendants Pacific Coast Automobile Association and W. Chalmers carelessly and negligently concealed from and failed and neglected to advise decedents thereof, but on the contrary informed decedents that proper inspection and adjustment had been made and said premises were safe for occupancy, and said decedents believed and relied upon the said representations of said defendants Pacific Coast Automobile Association and W. Chalmers; that said decedents had at said times no knowledge as to whether or

not said adjustments had been made, nor by reasonable inspection of said heaters could they have known whether said required and necessary inspection and adjustments had been made. . . . That by reason of the joint and concurrent negligence of defendants herein and each of them *as aforesaid* gaseous fumes were caused to and did then and there escape from said heater. . . . ''

The facts bearing upon this question of adjustment of gas-burning appliances as disclosed by the record are that the defendant gas company, which had for many years as a public utility corporation been supplying to the inhabitants of San Francisco and vicinity for lighting and heating purposes gas which it manufactured, on or about May 29, 1930, decided to substitute natural gas therefor. On account of the difference in the characteristics of the two gases it was necessary that appliances which had theretofore been adjusted for the proper burning of artificial gas be immediately readjusted for the safe and efficient use of its substitute. Accordingly the gas company divided its San Francisco territory into a number of districts, and employed some hundreds of mechanics familiar with the method of adjusting gas-burning appliances. By printed notice addressed to each of its gas consumers and sent by mail and also published extensively in the local daily newspapers, it informed such consumers that on a given date the change from artificial to natural gas would be made, that a readjustment of their gas-consuming appliances was essential, and that it would on the day of the change or immediately thereafter send one of its employees to the home or business establishment of each of its consumers for the purpose of making such adjustment. By the same notice it advised such consumers that if they wished to use their gas appliances before the arrival of its visiting mechanic they should have such adjustment made themselves. On May 29, 1930, the change from artificial to natural gas in the district in which the premises, 670 Turk Street are situated, was made, and on said day one of a corps of 1100 mechanics, employed by the defendant for the purpose of making these adjustments, called at said premises but found them unoccupied. Accordingly, no adjustment of any gas-burning apparatus which might then have been on said premises was made.

On June 5, 1930, Ray and Ryan, a copartnership engaged in automobile repairing, by arrangement with the owner or

lessee, moved into said premises and there commenced the conduct of their business. On June 13th, some two weeks after the change from artificial to natural gas and the visiting of consumers' establishments by the defendant's adjusting mechanics in said district had been completed, Ray and Ryan applied to the defendant to be supplied with gas for use in said business. Defendant at once sent an employee, one Otton, to 670 Turk Street for the purpose of turning on the gas-meter. He found that the meter was already turned on, and that Ray and Ryan had since taking possession of the premises been using the gas, and the date of the opening of the account with Ray and Ryan by the defendant was set back to correspond with the commencement of use. While the mission of Otton to the establishment of Ray and Ryan was not specifically to adjust gas appliances but merely to turn on the meter, he took occasion while there to ask one of the partners, Mr. Ryan, if they had any such appliances which needed to be adjusted for the use of the new gas. Asked by plaintiffs' counsel at the trial what reply he made to this request Ryan testified: "Well, as near as I can recall I said 'There is one heater in the office that needs adjustment' or 'needs to be looked at' or some words to that effect. I am positive about the office heater. He said 'Well, all right,' and turned and started to walk away, and I started to walk forward to some cars that were there, and I said 'There's some around here and they are not connected up,' and I pointed like that to another room where some of those heaters were stored or setting." Questioned by plaintiffs' counsel as to the reply that he made to Otton's questions as given by him at a former trial of this case he stated that in substance it was "I know there is one in the office and nothing done in there, but look around and see for yourself." Otton went to the office and made the necessary adjustment to a heater there installed, and when finished he asked an employee in the office if there were any more and received the reply "No, that's all."

At this time there were two small mezzanine rooms situated above the front portion of the working premises, in one of which was installed the gas heater the use of which caused the tragedy hereinbefore mentioned. This room was unused except as a receptacle for unwanted articles (termed in the evidence junk), was dirty and dusty, even filthy, and

it was not the room pointed to by Ryan as a place where Otton might find other and unconnected heaters. Indeed, there is nothing in the record to lead one to suppose that Ryan even knew that this heater was there, and it is a fair inference from the evidence that he did not. This heater remained unadjusted for the use of the new gas; and shortly thereafter the room was cleaned up and used by Ray and Ryan as sleeping quarters on occasions when one or the other remained in their business establishment so late at night as to make it inconvenient to return to their respective homes—which were both outside of the city.

On the night of July 6, 1930, John A. Ray, senior, occupied this room with his wife Alma S. Ray. About noon of the next day they were found there dead. When found the heater was burning, and it was apparent from their attire that they had not yet gone to bed, but were on the point of doing so. The dimensions of the room were about 12 by 9 by 6 feet, and it was unventilated except for what air might enter through a broken pane of glass, the hole in which, however, had been covered by a heavy towel—evidently for the purpose of keeping the cold air out. The gas heater was not furnished with any vent to the outside, but there was attached to it a small box containing various chemical substances, which the manufacturer claimed to be efficacious in rendering gas fumes harmless, but which, according to a printed notice on said attachment, should be changed regularly every year, or oftener if gas fumes became noticeable. It was testified by a chemist who made an analysis of these chemicals, and not disputed, that they were useless for the purpose claimed.

It will be seen from the foregoing recital that unless negligence can be predicated upon the failure of Otton to search for and discover the gas heater concerned in these fatalities there was no negligence proven against the defendant,—quite apart from the fact that such failure of Otton is not the negligence upon which the purported causes of action are founded. The negligence therein relied upon is the omission to adjust the gas-heating appliances in the premises at 670 Turk Street while under the immediate control of W. Chalmers and the Pacific Coast Automobile Association. The failure of Otton to search for such appliances was unknown to these co-defendants, and the plaintiffs do not contend otherwise. ■ That it was the duty of the gas com-

pany, upon changing the nature of the gas supplied to its customers, to warn them that it was necessary to adjust existing gas-consuming appliances for the safe and efficient use of the new gas, there can be no doubt; and the efforts made by the defendant to discharge this duty seem to us to have been quite sufficient. But Ray and Ryan became customers of the defendant after the change had been made and the adjustment of apparatus undertaken by the company completed. ▉ There is at all times and everywhere resting upon a person who acquires a mechanical appliance to be used by him in connection with an essentially dangerous substance such as artificial. or natural gas, the hazardous nature of which is universally known, the duty to see that such appliance is in its construction and adjustment suitable for its use in safety. He owes this duty to himself, and upon himself must rest the consequences of a failure to discharge it unless the duty has by contract or some legal relationship been cast upon another.

▉ It is sought by the respondents to uphold these judgments by contending that it was the duty of the defendant, upon receiving the application of Ray and Ryan to be supplied with gas, to find out and, if necessary, to search the premises for the purpose of discovering whether there existed thereon gas-consuming appliances unsuitable for burning the gas supplied by it, and if any were found, to make the necessary adjustment. Such a claim, we think, is startling in the extreme. ▉ It is attempted to be supported by the citation of cases, holding that a person or concern engaged in distributing an essentially dangerous commodity such as we are here concerned with, is held to a very high degree of care to see that in its distribution and while under the control of the distributor it shall not be permitted to harm anyone. Such cases are *Sawyer* v. *Southern Cal. Gas Co.*, 206 Cal. 366 [274 Pac. 544], and *House* v. *Wichita Gas Co.*, 137 Kan. 332 [20 Pac. (2d) 479], and many more might be cited. This responsibility, however, is limited to the time that the gas is contained in the gas company's own pipes or containers, unless it has negligently allowed it to escape, or, having escaped, has created a dangerous hazard known or which should be known to the distributor, and he has neglected to remedy the condition. (*Lewis* v. *Southern Cal. Gas Co.*, 92 Cal. App. 677 [268 Pac. 930]; *Ingledue* v. *Davidson*, 102 Cal. App. 703 [283 Pac. 840]; *Hill* v. *Pacific*

*Gas & Electric Co.,* 22 Cal. App. 791 [136 Pac. 492].) The greatest extension of this responsibility to be found in any case cited by respondents is where a gas company is supplying gas to a building containing a number of separate apartments but in which the pipes or conductors are interconnected, and the occupants of some of the apartments are consumers and others are not. As to the latter it is held that the company is negligent if any of its gas should be allowed to flow into the pipes in their apartments unknown to them and damage should result therefrom, as by the escape of gas into such apartments through an open gas cock or vent; and that the company is not relieved from responsibility because it has no right to enter the apartments of such nonusers for the purpose of investigating the gas pipes therein. (*Christo* v. *Macon Gas Co.,* 18 Ga. App. 454 [89 S. E. 532]; *Schmeer* v. *Gaslight Co., etc.,* 147 N. Y. 529 [42 N. E. 202, 30 L. R. A. 653].) We think it a far cry from such a situation to the one in the case at bar, wherein the fatalities were not caused by the unwanted introduction into the decedents' apartment of gas owned and controlled by the defendant, but by a poisonous gas generated therefrom in the operation by the decedents of an apparatus unsuitable for its use. ▮ The cases are uniform in holding that a person supplying gas or electricity is not responsible for the condition of the conductors or pipes on the premises of consumers which the former does not own or control (*Bell* v. *Brooklyn Union Gas Co.,* 193 App. Div. 669 [184 N. Y. Supp. 807]; *Southern Indiana Gas Co.* v. *Tyner,* 49 Ind. App. 475 [97 N. E. 580]; *Middleton* v. *DeKalb County Gas Co.,* 168 Ill. App. 353), and the same rule must on principle apply to the customer's own appliances provided by him for the consumption of the commodity supplied. (*Hill* v. *Pacific Gas & Elec. Co., supra.*)

▮ It is further contended by respondents that irrespective of the alleged duty of the defendant to adjust gas-consuming appliances, it did upon the introduction of its natural gas into San Francisco undertake to do so, and negligently failed to carry out the task undertaken.

We have seen that the offer made by advertisement in local newspapers and printed notices sent through the mail to the customers of the gas company was not a general offer to perform this service for everyone or indefinitely, but was confined to existing customers of the company, and was

evidently motivated by the fact that the company was voluntarily · changing the character of its gas supply, such change entailing the necessity of making suitable adjustment of gas-consuming appliances then in use. Ray and Ryan not being consumers at the time, did not come within the class to whom the offer was made. ▪ However, as we have seen, the company did through its employee Otton, at the time when he visited the business establishment of Ray and Ryan, offer to make adjustment of Ray and Ryan's appliances if any they had. This offer bound the company to the extent that it was accepted, there being a sufficient consideration for it in the benefit arising from the business relationship between the parties. It is, however, elementary in the law of contract that an offer to be binding must be accepted according to its terms, and any change in its terms by a purported acceptance is a rejection. The offer of defendant through Otton to adjust the appliances of Ray and Ryan implied on the part of the latter the obligation to facilitate performance by placing at the disposition of the defendant's representative the appliances to be adjusted. They could not, contrary to the implied terms of the offer, require defendant to search through their business premises in order to discover the whereabouts of the articles to be adjusted. The only heater exhibited to Otton was adjusted by him, and a second inquiry by him as to whether there were any others made to an employee of Ray and Ryan brought a negative response. We think it clear that under the circumstances defendant discharged its full duty to Ray and Ryan.

▪ So far as Mr. and Mrs. Ray, the deceased persons, are concerned, there is no doubt that notwithstanding that the obligation of the defendant to adjust gas-consuming appliances was one arising from contract—made by an offer and its due acceptance—a negligent performance by defendant of its duty thereunder by which a condition dangerous to the public was produced, would create a right of action in favor of anyone suffering damage thereby. (45 Cor. Jur., Negligence, sec. 18, p. 646; sec. 22, p. 650.) There is also no doubt that any negligence on the part of the defendant in the performance of the work undertaken, entailing like consequences to a third person, would give a similar right of action. (*Alabama Utilities Service Co.* v. *Hammond,* 225 Ala. 657 [144 So. 822].) These principles, however,

have no application here, in the absence of proof of negligence on the part of defendant.

It results from what we have said that the plaintiffs failed to establish any negligence upon the part of the defendant, and that the latter's motion to instruct the jury to bring in a verdict in its favor ought to have been granted.

While this conclusion renders unnecessary a detailed, or perhaps any, discussion of the other contentions of the appellant, it may not be inappropriate to say that its contention as to the excessive amount of the verdicts is, we think, entirely justified.

There was no evidence that the plaintiffs suffered any direct pecuniary loss by the death of their parents. They were both self-supporting and not living at home. It is true they visited the home of their parents more or less frequently on week-ends, and we may assume that on such occasions they rendered no *quid pro quo* for their entertainment. On the other hand, there is no evidence that the deceased parents owned any property, or that there was any likelihood that they would ever accumulate any in the future. The venture in the establishment in conjunction with Mr. Ryan of the automobile repair business already referred to was quite recent, and whether it would prove profitable yet remained to be seen. There was very little probability that the deceased parents would ever be in such financial position that during their lives the plaintiffs would derive any pecuniary benefit from them. The young man was even paying for his own education by his earnings, and the only pretense of financial loss suffered by the plaintiffs by reason of the tragic death of their parents was that they thereby lost the advantage of their society, and the care, comfort and counsel which in the event of necessity they might legitimately expect to receive from them.

The action is brought under section 377 of the Code of Civil Procedure, which authorizes a jury to award such damages ''as under all of the circumstances may be just''. A number of cases, wherein the contention that the damages allowed were excessive was not sustained, are cited by respondents in support of these verdicts. The verdicts in those cases were generally for smaller amounts than those in the case at bar, and involved other elements than those here relied upon, such as the loss of support by wives or· minors or dependents. The most liberal of them is the late

case of *Gilmore* v. *Los Angeles Ry. Corp.*, 211 Cal. 192 [295 Pac. 41, 45]. There a verdict of $7,500 in favor of a widow and two adult children was upheld. It was based upon the loss by the wife of her legal right of support and of the comfort and care which all three might have expected to receive from the deceased; and the court takes occasion to point out that the "loss of comfort, protection and society is by no means to be classed as compensable by merely nominal damages". Measured even by the standard of this case the verdicts here are in our opinion grossly excessive.

This with our conclusion that the record contains no evidence of negligence on the part of the defendant Pacific Gas and Electric Company renders it necessary to reverse the judgments.

The orders and judgments appealed from are reversed, and the trial court is directed to enter judgment in each case in favor of the defendant.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 21, 1935.