[No. F007175. Fifth Dist. Jan. 11, 1988.]

ALEJANDRO HERNANDEZ MENDOZA et al., Plaintiffs and Appellants, v.
EASTON GAS COMPANY, Defendant and Respondent.

782

COUNSEL

Wilcoxen & Callahan and James R. Montgomery for Plaintiffs and
Appellants.

McCormick, Barstow, Sheppard, Wayte & Carruth, Stephen R. Cornwell and David H. Bent for Defendant and Respondent.

## Opinion

**FRANSON, P. J.—**

### The Case

On December 17, 1980, four itinerant farm workers died and another suffered permanent brain damage as a result of inhaling carbon monoxide fumes from an unvented propane stove. Plaintiffs filed a wrongful death-personal injury action against Easton Gas Company (Easton), the supplier of the propane gas, and others on negligence and strict liability theories. The trial court granted Easton's motion for summary judgment on the ground Easton owed no duty of care to the injured parties.

We hold the trial court erred in granting summary judgment because the defendant failed to negate all theories of a duty of care under the particular facts presented below. Specifically, the defendant failed to negate its duty to inspect the gas pipes inside the house for leaks before it first released gas into the house. Whether the defendant's failure to inspect the inside pipes before releasing the gas was a proximate cause of the plaintiffs' injuries will be a fact question for the jury.

### The Facts

Mr. and Mrs. Reitz owned a house which they had made available to their seasonal farm workers since 1972. The house had a furnace and water heater fueled by a propane tank located some 75 feet away from the house; however, before the accident the pilot light to the furnace had been turned off by the owners.

Around 1978 Mr. Reitz purchased a used stove with an oven and five burners for the kitchen. Because the oven was inoperable, neither the stove nor the oven was vented. Mr. Reitz did not intend for his employees to heat the house with the oven or the burners. Unfortunately, one cold December night in 1980, the workers attempted to heat the house with the five burners and suffered the injuries described.

The tank in question had been used by the Reitzes since 1964, originally with butane gas for the appliances in the house; later the tank was changed

over to propane. After using another propane supplier for approximately two years, the Reitzes contracted with Easton for delivery of the propane. Easton filled the tank with propane on three occasions: November 29, 1979, May 9, 1980, and December 9, 1980, a week before the accident.

Each time a delivery was made, Easton employees visually inspected the gas tank and the lines from the tank to the residence and found the system acceptable for delivery of propane. However, at no time during any of the propane deliveries did the Easton employees use a pressure gauge at the tank to determine if there were any leaks in the pipes inside the house nor did they visually inspect any of the pipes or appliances into which the propane gas was delivered inside the residence. Leslie Reynolds, an Easton employee, explained in his declaration that this was because the Reitz premises were considered "an existing hookup." It was not Easton's custom to make such inspections for customers having existing hookups, unless specifically requested by the customer. Donald Baumback, the owner of Easton, testified that it was not the custom or practice of his company or within the liquid propane gas industry for dealers to conduct inspections or investigations into a gas system unless requested by the owner.

No one informed Easton for what purpose the propane gas was to be used in the house, what appliances were in the house or whether they were operable. Easton did not have notice of any defects in the interior pipes or appliances. Easton was never asked to inspect or service the appliances inside the house.

## DISCUSSION

### I.  *Standard of review.*

■  Review of a summary judgment is limited to determining upon a de novo examination of the documents presented to the trial judge whether there is lacking a genuine issue of material fact so that the moving party is entitled to judgment as a matter of law. (*Scroggs* v. *Coast Community College Dist.* (1987) 193 Cal.App.3d 1399, 1401 [239 Cal.Rptr. 916].)

In making the determination, the reviewing court examines the papers in support of and in opposition to the motion. The affidavits of the moving party are strictly construed, and those of the opponent are liberally construed. Doubts are resolved in favor of the party opposing the motion. (*D'Aquisto* v. *Campbell Industries* (1984) 162 Cal.App.3d 1208, 1212 [209 Cal.Rptr. 108].) When the defendant is the moving party, he must negate a necessary element of plaintiff's case or establish a complete defense so there

is no material factual issue which requires a trial. (*Saatzer* v. *Smith* (1981) 122 Cal.App.3d 512, 517 [176 Cal.Rptr. 68].)

## II. *The duty of care.*

██ Whether a duty exists is primarily a question of law.

"It is the court's 'expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' [Citation.] Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall." (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].)

██ Easton relies on the 1928 Court of Appeal decision of *Lewis* v. *Southern Cal. Gas Co.* (1928) 92 Cal.App. 670 [268 P. 930] to support its contention that no duty was owed by it under the facts of this case. In *Lewis,* plaintiff was injured by a flame which shot out of a gas oven when she opened the door to check on its contents. About a month before the accident, a gas company employee had gone to plaintiff's apartment, turned on the gas at the meter and tested two burners on the stove to see if gas was coming through the pipes; however, he did not check the oven. Contrary to what the trial court had found, the appellate court determined there was no negligence on the gas company's part for its failure to check the oven because there was no duty to check the pipes or appliances inside the dwelling: "'The general rule requiring the use of ordinary care and diligence on the part of a gas company applies to its delivery of gas into the residence or other building of the consumer. . . . [H]owever, . . . in the absence of any fact upon which to base an inference of duty, the failure of the gas company, on introducing gas into a dwelling, upon application, to inspect pipes or fixtures which were placed there by the owner, and over which the company had no control, is not negligence. *The company is warranted in assuming that the interior system of pipes is sufficiently secure to permit the gas to be introduced with safety.* To render the company liable in such cases, there must be facts alleged to show notice of defects, or facts from which an inference of duty to inspect arises, either from contract, custom or franchise.'" (*Id.* at p. 676, italics added.)

However, in *Sawyer* v. *Southern California Gas Co.* (1929) 206 Cal. 366, 371-372 [274 P. 544], our Supreme Court gave a broader scope to the duty of care owed by a gas supplier. It said that in addition to the duty of making inquiry upon notice of possible defects in the gas pipes inside the house, the

gas supplier must make inquiry or investigation to satisfy itself that all openings in the pipes inside the house are closed before it turns on the gas for its first delivery: "It is not in all cases a sufficient answer to a claim of liability against a gas company that the cause of the escape . . . of gas is to be found in the condition of the house pipes, which the gas company does not own or control. There are well-considered cases of other jurisdictions to the effect that a gas company may be liable where it either directs its employees to turn on a gas-meter, or authorizes the person applying for gas to turn it on, and an explosion occurs by reason of an escape of gas through a house pipe connected with the meter which was uncapped or severed at the time the meter was turned on."

While the *Sawyer* court recognized the general rule that a gas company has no duty to inspect house pipes after service has once been established, it carefully explained that "it does not follow that a gas company may turn on meters through which gas passes into uncapped house pipes without incurring liability for injuries to persons or property caused thereby, . . . It would appear to be the duty of a gas company to make some inquiry or investigation to satisfy itself that all openings in the house pipes are closed *at the time it turns on its meters.*" (Italics added, 206 Cal. at p. 372.) Thus, *Sawyer* recognized a wider duty on gas suppliers than did the Court of Appeal in *Lewis, supra.*

The Supreme Court reaffirmed *Sawyer* in *Ambriz v. Petrolane Ltd.* (1957) 49 Cal.2d 470 [274 P. 544]. In *Ambriz,* the court was faced with a factual situation quite similar to the present case. The plaintiffs were seasonal farm workers who had been provided with cabins in which to live as part of their employment. A 600-gallon fuel tank with pipes to each cabin provided butane gas for use in the cabins. Each cabin had a gas outlet pipe protruding through its exterior wall to the inside of the cabin. The outlet had a valve but was not capped.

Before plaintiffs moved into the cabin, defendant Petrolane filled the fuel tank but did not check the outlets inside the cabins to see if they were leaking. During the two prior years, Petrolane employees had inspected and found leaks in the valves in some of the cabins and had informed the owner of this fact. No inspection was made the year of the accident.

Plaintiffs cooked their evening dinner on a kerosene stove, turned it off and went to bed. A few minutes later, there was an explosion and fire which injured plaintiffs and killed their three children.

The Supreme Court first acknowledged the general rule that liability flows from knowledge of a dangerous condition. Since the gas company had

had knowledge of leaks in other cabins in prior years, it was foreseeable there might be leaks in plaintiffs' cabin when the last delivery was made; hence, a duty of care arose to inspect the cabin's interior pipes. Rather than stopping at this point, however, the *Ambriz* court proceeded by way of dicta to restate and apply the *Sawyer* rule concerning a gas company's duty to inspect the pipes inside a house when it first delivers gas to the house.

"Furthermore when gas is first turned on by a gas company (here it was in effect the same as if it was the first delivery of the season there having been no use of the gas since the last season), it must exercise care as to the condition of the property owner's own pipes and connections. . . . '[A] gas company may be liable where it either directs its employees to turn on a gas-meter, or authorizes the person applying for gas to turn it on, and an explosion occurs by reason of an escape of gas through a house pipe connected with the meter which was uncapped or severed at the time the meter was turned on. . . .

" 'While it is generally held that there is no duty on the part of a gas company to inspect house pipes after service has once been established, and consequently no liability for injuries resulting from an escape of gas through house pipes which become defective in the absence of notice of a leak in the house pipes . . . it does not follow that a gas company may turn on meters through which gas passes into uncapped house pipes without incurring liability for injuries to persons or property caused thereby, . . .' " (49 Cal.2d at p. 479.)

■ We derive two propositions from *Ambriz*: First, when a butane or propane supplier first delivers gas to a customer's premises for either a new or existing hookup (we find no room for an existing hookup exception), it must check all the lines leading from the tank to the inside of the dwelling for leaks. This may be done either by visual inspection of the lines and pipes inside the house or by the use of a pressure gauge at the tank to determine if there are any leaks in the pipes. As explained in *Ambriz*, ". . . a pressure gauge is customarily used before gas is put into a tank and may be placed without entering the cabins. Air is pumped into the pipe lines and if the pressure drops, a leak is indicated. . . . there is evidence that the pressure gauge test is always used when an empty tank is filled." (*Ambriz, supra,* 49 Cal.2d at p. 476.) Since we are unable to determine from the record in the present case whether the tank was partially full when Easton made its last delivery of gas just a week before the accident, it can be inferred that the tank was empty.

The duty which we find to apply to every gas supplier at the time it acquires a new customer comports with the *Ambriz* and *Sawyer* reasoning

which is to protect consumers of highly dangerous products from injuries which can be easily prevented by the utilization of simple, inexpensive procedures at the time the product is first delivered.

The second proposition which we derive from *Ambriz* has reference to those dwellings situated in the mountain and rural areas of our state where propane and butane gas is delivered on a *seasonal basis,* such as the farm worker house in the present case. *Ambriz* treats the delivery of the gas at the beginning of a new season as a first delivery which imposes on the supplier the duty to check for gas leaks inside the dwelling. In *Ambriz* the defendant gas company had been selling gas to the subject premises for several years before the accident. The court nevertheless noted that the first delivery of gas for a new season (it did not define the season), there having been no use of gas since the last season, would come within the rule imposing a duty to inspect "when gas is first turned on by a gas company." (*Ambriz, supra,* 49 Cal.2d. at p. 479.) We can speculate that the rationale for imposing a duty to inspect the interior pipes for leaks when gas is first delivered for a new season is the foreseeability of damage or wear to the interior pipes as a result of weather or vandalism during the off season when the cabin is unoccupied. ■ In any event, under the *Ambriz* language, absent proof that this was not the first delivery of a new season, Easton has not met its burden of negating the existence of a duty to check the interior pipes for leaks when it delivered gas on December 9, 1980.

We find nothing in *Hill* v. *Pacific Gas & Electric Co.,* (1913) 22 Cal.App. 788 [136 P. 492] and *Ray* v. *Pacific Gas & Electric Co.* (1934) 3 Cal.App.2d. 329 [39 P.2d 812], cited by Easton, to alter our interpretation of the scope of the duty articulated in *Ambriz.* *Hill* and *Ray* are distinguishable on their facts; furthermore, if they contain any language contrary to our reading of *Ambriz,* we will follow the Supreme Court. ■ Dicta of the Supreme Court should not be disregarded by an intermediate court without a compelling reason. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeals, § 785, p. 756.) ■ We find no compelling reason to disregard the *Ambriz* language since it promotes a sound public policy. We conclude, therefore, that Easton failed to negate a duty of care on the particular record before us.

III. *Proximate cause.*

Because the trial court granted summary judgment on the basis that no legal duty of care existed, it did not rule on the proximate cause issue. Easton asks this court to do so as a matter of law. We decline the invitation.

Whether Easton would have been placed on notice that the oven and stove were unvented in the farm workers' cabin if it had performed its duty

of checking the interior pipes to see if they were leaking or were otherwise defective, is unanswerable on the present record. If Easton had gone into the house to check the pipes, it might have noticed the unvented stove. If it had used a pressure gauge outside the house and no leaks were observed, it would have had no reason to go into the house. Because no investigation was made, we are left to speculate whether the pipes inside the house had any leaks.

Too many rational inferences may be drawn which might establish proximate cause. The fact is that Easton failed to make any check of the interior pipes, and whether this negligence in any way contributed as a legal cause to the accident can only be established at trial where all relevant evidence will be presented to the jury.

The judgment is reversed. Appellants to recover their costs on appeal.

Martin, J., and Best, J., concurred.