[S. F. No. 14763. In Bank.—December 1, 1933.]

H. A. GERDES et al., Respondents, v. PACIFIC GAS AND
ELECTRIC COMPANY et al., Appellants.

Thomas F. Straub and Clinton F. Stanley for Appellant Pacific Gas and Electric Company.

Eustace Cullinan and Hadsell, Sweet & Ingalls for Appellant Olympic Salt Water Company.

Ford & Johnson and Fletcher A. Cutler for Respondents.

SEAWELL, J.—Plaintiff H. A. Gerdes and Barbara Gerdes, his wife, received personal injuries in an explosion and fire which almost completely demolished their residence.

The husband brought an action to recover for personal injuries sustained by him and a separate action to recover for loss of services of his wife and for her medical, hospital and other expenses. Mrs. Gerdes brought an action to recover for personal injuries sustained by her, and Mr. and Mrs. Gerdes, together with the two companies carrying insurance on the Gerdes' residence and furnishings, filed a fourth suit to recover for the destruction thereof. The actions were consolidated for trial. The court granted a nonsuit as to defendant Spring Valley Company by consent of all parties. The case as to the other three defendants went to the jury, which returned a verdict in favor of plaintiffs against the Pacific Gas and Electric Company and the Olympic Salt Water Company, but exonerated the city and county of San Francisco. By said verdict damages were assessed in the total sum of $40,000, apportioned as follows: personal injuries to Mrs. Gerdes, $15,000; personal injuries to Mr. Gerdes, $7,500; to Mr. Gerdes for loss of services of his wife and for her hospital and medical expenses, $5,000; loss of residence and furnishings, $12,500. In denying defendants' motion for a new trial, the court reduced the total damages to $25,000, without allocating the deduction to the several items included in the verdict. From the judgment thus reduced defendant Pacific Gas and Electric Company and Olympic Salt Water Company prosecute this appeal.

The plaintiffs' residence is situate in the city of San Francisco on the east side of Forty-seventh Avenue in the block bounded by Balboa Street on the south and Sutro Heights Avenue on the north. A sixteen-inch salt-water main of the Olympic Salt Water Company is laid beneath the pavement on Forty-seventh Avenue on the easterly side of the street near the curb line. About a foot and a half west of this sixteen-inch main is a four-inch fresh-water main, which at the date of the explosion, March 18, 1930, constituted a part of the water distribution system acquired by the city and county of San Francisco by transfer from Spring Valley Company about fifteen days before the accident. Next in position is an eight-inch high pressure gas main of the Pacific Gas and Electric Company, and finally a six-inch low-pressure pipe-line of said company, from which run service pipes supplying gas to the residences along Forty-seventh Avenue and passing above the eight-inch gas main

and the two water mains. A telegraph cable line is also laid in the street, but is not involved in the accident herein.

Forty-seventh Avenue between Balboa Street and Sutro Heights Avenue has a relatively steep grade of eighteen per cent, running uphill from Balboa north to Sutro Heights Avenue. The Gerdes' home is the second house from the southeast corner of Forty-seventh and Sutro Heights Avenues. The location is within a few blocks of the ocean beach and Cliff House, and consequently the ground upon which the district is built consists of sand washed up from the ocean.

On the date of the accident the pavement of Forty-seventh Avenue broke open at a point approximately opposite the northerly line of the Gerdes' lot at about 4:45 o'clock in the afternoon, releasing a strong force of water. The sand beneath the pavement washed away very rapidly. The pavement caved in, creating an excavation 150 feet long, 25 feet wide and about 20 feet deep, which revealed that both the salt-water main of the Olympic Salt Water Company and the fresh-water main of the city and county had broken. The question of which main broke first was an important issue in the case. The jury by returning a verdict for the city and county upheld its contention that the salt-water main of the Olympic Salt Water Company broke first, and that the weight from the pavement and street as it caved in caused the city's four-inch main to break. Neither the six-inch nor eight-inch main broke. The sidewalk on the easterly side of the street in front of the Gerdes' home fell into the excavation. The gas service pipe leading from the six-inch low pressure main to the meter in the basement of the Gerdes' home was within this excavation. It appears without conflict that the weight of the pavement and sidewalk as it caved in had bent down said service pipe, causing it to separate partially from its connection with the riser, a perpendicular pipe which runs from the horizontal service pipe to the meter, with the result that gas escaped into the Gerdes' basement. A few minutes before 8 o'clock P. M. the gas was ignited in an unexplained manner and the explosion and fire followed in which Mr. and Mrs. Gerdes were injured and their home destroyed.

The plaintiffs sought to prove upon the trial that the gas company was negligent in failing to turn off the gas pass-

ing into this service pipe or to plug up the leak within a reasonable time after receiving notice of the street cave-in. Both said company and the Olympic Salt Water Company contend on this appeal that plaintiffs' recovery for their personal injuries is barred by their contributory negligence as a matter of law in failing to remove from their home before the explosion took place.

The fire department responded to an alarm received at 4:54 P. M. The firemen found a hole in the street approximately six feet by ten feet, by eight feet deep. Lieutenant Shade got into this hole and observed water gushing from the sixteen-inch main of the Olympic Salt Water Company. He observed no other broken pipe at that time. As he stood in the hole, the street suddenly commenced to cave in rapidly and he hurriedly climbed out. Within a few minutes the automobile of the witness Capener, a coffee, tea and spice salesman, fell into the cavity. Capener had moved his automobile after observing the fissure in the street, but the washout was progressing so rapidly to the place to which he had moved it that he dared not approach it again. Lieutenant Shade went into one of the houses on the block and called the number of the Spring Valley Company, thinking that the sixteen-inch main was the property of that company. He reached the city water department which had taken over the telephone number of the Spring Valley Company upon transfer of the water system to the city. A repairman arrived from the water department, but he did not know where to shut off either the city's main or the sixteen-inch main. Shade also telephoned to the Pacific Gas and Electric Company. His conversation with that company will be gone into more fully when we come to consider the question of that company's liability. Officer Dolan of the police department was one of the first persons to observe the break. He notified his station and immediately returned to the scene and roped off the street.

Mrs. Gerdes was in her home at the time of the break and her attention was not attracted until after the automobile had fallen into the excavation. She went down her front steps and observed the catastrophe. She testified that she felt very frightened, as it appeared to her as if the outer line of the excavation would move toward the property line, and that her home would slide into it. She immediately ·

telephoned to her husband and said to him, "Come home immediately, something terrible has happened out here. I cannot quite explain it." She estimated the time when she called her husband as 5:15. She had detected a slight odor of gas as she went up the front steps into the house. She inspected her gas range and found no gas escaping there. After she had telephoned to her husband firemen Jensen and Harrigan appeared at her front door. She testified that the firemen said to her that they had been sent to take her out of the house, and she told them she had telephoned her husband and would wait for him. There is evidence that Mrs. Jenkins, a neighbor and close friend of Mrs. Gerdes, had requested the firemen to ask Mrs. Gerdes to leave the premises and come to Mrs. Jenkins' home on Forty-eighth Avenue, away from the cave-in. There is no evidence that any person in an official position had instructed the two firemen to remove Mrs. Gerdes from the house. Mrs. Gerdes testified that she and the two firemen opened all the windows and doors in the house. Before the windows were opened there was a slight odor of gas, "but nothing you would hardly notice". It was most noticeable in the front part of the house, but in some parts it was not noticeable at all. After the windows and doors had been opened there "was no odor of gas that one would notice at all".

Fireman Jensen testified that as he entered the Gerdes' home he detected the odor of gas, but not in very great quantities. After looking at the gas stove he and fireman Harrigan went down into the basement, and heard a "roar" of gas. The point of connection of the riser and service pipe, which had partially separated to cause the leak, was not visible, as cement or concrete had been placed around the connection. He put his hand down and could feel the flow of escaping gas. As the break occurred before the pipe reached the meter, it could not be remedied by turning off the gas at the meter. When the doors and windows had all been opened there was practically no smell in the floor above the basement. He informed Mrs. Gerdes of the location of the leak and cautioned her not to light any matches. He told Mrs. Gerdes that as long as her husband was coming home so soon the proper thing would be to wait until he arrived, that "he didn't think there would be any immediate danger at that particular time".

Fireman Jensen further testified that as Mrs. Gerdes seemed to be in a weakened condition and did not seem strong, he thought it would be best for her husband to take care of her. Mrs. Gerdes had suffered a paralytic stroke on her left side six years previously, and was lame as a result thereof, although she was able to walk without a crutch or cane.

The testimony of fireman Harrigan, who accompanied Jensen into the house, was substantially to the same effect as Jensen's testimony. Harrigan detected a slight odor of gas as he entered the house. When the windows had been opened there was only a very slight odor from the gas, and there was no danger at the time they left.

Mr. Gerdes arrived home between 5:30 and 5:40, just as the two firemen left. Harrigan told him to be careful, as the pavement in front of the house, except for one section, had washed away. Mr. Gerdes also noticed a faint odor of gas as he entered the house. At about 6 o'clock the Gerdes ate a cold supper in their breakfast room at the back of the house. Mr. Gerdes frequently went to the front of the house to observe conditions in the street. After finishing supper Mrs. Gerdes put on her hat and coat. Mr. Gerdes went to Forty-sixth Avenue to the home of Captain Wilson, a member of the fire department and a friend of Mr. Gerdes. Captain Wilson, although not connected with the company on duty at the scene of the accident, seems to have interested himself in it. He first observed conditions at 5:20 and attempted to locate the valve where the water could be turned off. The company with which firemen Shade, Jensen and Harrigan were connected returned to the firehouse before 5:48, at which time they went out at the request of Captain Wilson, who believed he had found the valve to shut off the water at Forty-sixth Avenue and Anza Street. This valve failed to shut off the flow from the sixteen-inch pipe, and the company returned to the firehouse and was not again at the scene until it responded to the alarm at 8:01 after the explosion.

Captain Wilson returned with Mr. Gerdes to the Gerdes' home, and together they went into the basement, where Captain Wilson located the leak. Mr. Gerdes had not previously gone into the basement. Captain Wilson went outside and warned the workmen in the street not to smoke or

light matches, and also warned them against bringing the lighted lanterns which he observed near the premises. He went upstairs and notified the Pacific Gas and Electric Company of the leak. As he was about to leave he observed that Mrs. Gerdes had swooned on the sofa in the living-room. He called Mr. Gerdes and together they placed her in a chair just inside the front door and in a few minutes moved her onto the porch just outside the door. Just as a representative from the gas company arrived the explosion occurred. We will discuss the evidence of earlier calls to the gas company hereafter when we consider the liability of said company.

Appellants contend that as a matter of law plaintiffs were guilty of contributory negligence in failing to leave the premises before the explosion, which negligence bars their recovery for personal injuries. Both Mr. and Mrs. Gerdes knew that gas was escaping into the basement of their home, but were they bound to anticipate that the probability of an explosion occurring under the circumstances of which they had knowledge was so great that it can be said, as a matter of law, that in the exercise of reasonable care for their own safety they should have left their home before the explosion occurred? That both plaintiffs knew that gas is a dangerous substance is indicated by the precautionary measures in which they participated. All windows and doors in the house were opened by firemen Jensen and Harrigan and Mrs. Gerdes and left open continuously until Mr. Gerdes reached home about 5:30. Mr. Gerdes sought the advice of Captain Wilson, a member of the fire department, as to what should be done about the gas. When Mr. Gerdes observed workmen smoking in the street he called Captain Wilson's attention to the fact, and Captain Wilson explained the situation to the workmen and instructed them not to smoke or bring lighted lanterns near the Gerdes' basement. Among the men to whom he spoke was Commissioner Myers of the Board of Public Works, to whom he pointed out the gas leak. The jury may have concluded that in view of the fact that all windows and doors had been opened to insure a thorough circulation through the building, and warnings had been given against bringing any fire near the gas leak, plaintiffs believed that their safety was reasonably assured.

The street had been roped off by the police to keep by-standers away.

Appellants rely strongly on the remarks made to Mrs. Gerdes by firemen Jensen and Harrigan, and communicated by her to Mr. Gerdes, as warnings of the danger of an explosion. Although the firemen went to the Gerdes' front door with the object of assisting Mrs. Gerdes from the house, they had not set out with the purpose of removing her because of the gas leak, as they were not aware that gas was leaking until just as they entered the house, and then the odor was not so pronounced that it would cause any alarm. The firemen testified that a lady outside (Mrs. Jenkins) wanted to bring Mrs. Gerdes into her home, and that they informed Mrs. Gerdes of this, but she said she preferred to stay until her husband came home. As noted above, there is no showing that any person in an official position had instructed the firemen to remove Mrs. Gerdes. The jury may have concluded from the testimony as a whole that had it not been for the request of Mrs. Jenkins, the firemen would not have suggested that Mrs. Gerdes leave. They both testified that after the windows and doors had been opened there was practically no odor of gas except in the basement, and that there was no danger at that time from the gas exploding.

It does not appear that the firemen clearly and definitely impressed on Mrs. Gerdes the necessity for leaving immediately on her husband's arrival. Although in response to leading questions put to him on cross-examination as to whether he told Mrs. Gerdes that it would be well to leave when her husband reached home, and as to whether he wished to move her because of the gas, fireman Jensen gave affirmative replies, this portion of his testimony is not conclusive, since it clearly appears from other portions of his testimony that he had gone to assist Mrs. Gerdes at the request of her friend and before he was aware of the gas leak. Notwithstanding fireman Harrigan met Mr. Gerdes just as Mr. Gerdes was about to enter his home, and warned him to step carefully because of the collapse of the sidewalk, there is no evidence that he gave any direction or suggestion whatsoever to Mr. Gerdes to leave the house on account of the gas. Fireman Harrigan told Mrs. Gerdes to remain in the rear of the house, but he testified that this was not be-

cause of the escaping gas, but because at the time he saw her he feared that the front part of the house would be undermined by the washout.

Although firemen Jensen, Harrigan and Wilson all described the noise made by the escaping gas in the basement as a "roar", the jury may have inferred that they used this term for want of a more apt word to describe the characteristic sound made by gas escaping from a pipe, rather than that the noise was particularly loud. There is no evidence that it was loud enough to be heard in the rooms above the basement.

One of the strongest circumstances in favor of plaintiffs is the fact that Captain Wilson of the fire department, who examined the gas leak some time after 7 o'clock, made no suggestion that the Gerdes leave the premises because of the gas, and himself went in and out of the house several times to telephone, and was at the phone at the time of the explosion. Captain Wilson had assisted in moving Mrs. Gerdes out onto the front porch into the open air. Although if plaintiffs as a matter of law were guilty of contributory negligence, their conduct would not be excused because Captain Wilson was also negligent, the fact that Captain Wilson, upon whom plaintiffs no doubt relied as having greater knowledge of the propensities of escaping gas than plaintiffs, was in and out of the house several times to make telephone calls, including the call to the Pacific Gas and Electric Company, is some evidence that plaintiffs' conduct in remaining on the premises was not unreasonable. It would have been a simple matter for Captain Wilson to have telephoned from some other house had he apprehended any danger of explosion. Captain Wilson had been aware of the conditions in the street since 5:20 in the afternoon and doubtless realized that the gas had been escaping for some time. It cannot be said that plaintiffs were guilty of contributory negligence as a matter of law in failing to notify the gas company themselves earlier in the evening. The fire department and police department had taken charge of the situation, and the jury may have inferred that plaintiffs believed that all necessary steps were being taken to protect their lives and property.

Appellants also rely on the fact that Mrs. Gerdes had become stupified and dazed from the gas while she sat in

the front room of the house with her hat and coat on as indicating that she must have known that gas was present in dangerous quantities. She testified that she had previously experienced no discomfort from the gas. The jury may have concluded that the effect of the gas was so gradual that before Mrs. Gerdes realized what was happening she was partially overcome by it. The jury may also have concluded that her swooning was due in part at least to the strain and fright of the events of the afternoon operating upon her paralytic condition. Doubtless timidity and knowledge of her weakened condition and lameness made her hesitate to remove to unaccustomed quarters. After swooning she was removed to the front porch, where she was not likely to be overcome by gas. We cannot say that as a matter of law Mrs. Gerdes' conduct indicated a callousness or disregard for her own safety, or that having been partially overcome by the gas she should have anticipated an explosion. In weighing the evidence the jury no doubt took into consideration that the Gerdes were in their own home. A home is traditionally regarded as a place of safety, security and comfort, especially by persons who are in weakened health or aged, and a greater degree of danger should be present to raise an inference of contributory negligence under such circumstances than in other situations.

If reasonable persons would disagree as to whether plaintiffs were negligent under all the facts and circumstances presented in this case, then the judgment of the trial court must be affirmed. We are of the view that this is a case wherein reasonable persons would disagree on the issue of contributory negligence, and therefore the verdict of the jury and judgment on this issue cannot be disturbed by this court on appeal.

There remain to be considered the questions which arise with regard to the negligence of the appealing defendants. Mr. English, superintendent of construction for the Pacific Gas and Electric Company, arrived in front of the Gerdes' residence just as the explosion occurred in response to Captain Wilson's report to the gas company. The written records of the gas company show that Captain Wilson's call was received at 7:50, and that Mr. English was sent out at 7:52. The alarm immediately after the explosion was received by the fire department at 8:01. Although Captain

Wilson fixed the time when he called the gas company as some time before 7:30, he was merely computing the time by reference to what he did between the time when he left his own home to go to the Gerdes' residence and the time of the explosion. We think it must be conceded from the record that the gas company responded promptly to Captain Wilson's notification. However, there is evidence that several persons, including a member of the fire department and a police officer, acting in the line of their duty, telephoned the gas company soon after the street commenced to cave in. Lieutenant Shade, a member of the fire company which responded to the alarm at 4:54, called the gas company at 5:20, and explained that there had been a cave-in and the street was entirely washed out. Mrs. Purcell, who lived on Anza Street near the cave-in, also called the gas company. The witness Kirhan, who lived a few doors south of the Gerdes on Forty-seventh Avenue, and Police Officer Oliver L. Hassing, on duty at the Richmond Station, also testified that they reported the condition of the street at about 5 o'clock or soon thereafter. These witnesses all feared that the poles on the easterly side of the street, which carried electric wires, would fall, and so reported to the gas company. All, however, testified that they explicitly described the cave-in and washed-out condition of the street.

The gas company produced written records only of Lieutenant Shade's complaint, received at 5:20, and of Captain Wilson's communication at 7:50. The failure of the gas company to arrive upon the scene sooner would appear to be due to the fact that the person or persons who received Lieutenant Shade's complaint at the special service board maintained by the gas company assigned it only to the electrical plant of the company as a complaint concerning the poles, without notifying the gas department. Although Lieutenant Shade asked the operator who received his call for the electric trouble department, this should have made no difference since the receiving operator transferred all complaints, whether concerning gas or electric service, to the service switchboard, and the persons in charge of that board received the complaints and thereafter notified the gas or electric department, depending on the nature of the complaint. The poles on the easterly side of the street were known by the electrical plant to be poles of the Great Western Power

Company, and the Pacific Gas. and Electric Company therefore made no sufficient investigation of the conditions in the street. It also seems likely that the reports not noted by the company in its records may have been regarded as duplicates of the complaint made by Lieutenant Shade, and not entered for that reason. The superintendent of the service bureau for the gas company testified that it was the duty of employees to keep a record of duplicate complaints, but one of the night operators testified that he received a complaint after 8 o'clock, but made no entry of it because men had already been dispatched to the scene upon the earlier complaint. This indicates that a record was not always made of duplicate complaints. It was the special duty of persons assigned to the service switchboard to handle complaints. The jury may well have concluded that the persons who received the complaints were highly negligent in failing to perceive from the description received of the conditions in the street that the gas pipes were most likely to be affected, and the lives and property of the residents in the district endangered, and that said persons on the service switchboard plainly should have notified the gas department of the company. (*Foley* v. *Northern California Power Co.,* 14 Cal. App. 401, 406 [112 Pac. 467].)

 The court gave a *res ipsa loquitur* instruction as to defendant gas company. We are of the view that the criticised instruction should not have been given. However, we think said instruction was not sufficiently prejudicial to said company to constitute reversible error. The effect of said instruction as to the gas company would be to raise an inference of negligence against it which it would be required to rebut by evidence tending to show its freedom from negligence. We think that upon the record said company demonstrated that it was free from negligence except in reporting to the scene of the accident to repair whatever damage had resulted to its pipes, or to remove the danger therefrom, within a reasonable time after it had been informed of the caving in and washing out of the street. In this situation the verdict of the jury must be held to be a finding against the gas company as to negligence in this particular respect. It cannot be presumed that the jury may have believed that said company was free from negligence in this particular, but nevertheless returned a verdict against

it, although the evidence as a matter of law clearly showed the company to be free from negligence in all other respects.

We are further of the view that the evidence is sufficient to sustain a finding of negligence against defendant Olympic Salt Water Company. The sixteen-inch salt-water main of said company was of cast iron and had been in the ground between thirty and thirty-five years. The break in this pipe was jagged and irregular, and part of the broken surface appeared to be rusted and corroded, while another section was bright. There were cracks on the side of the pipe, running back from the broken edge, which some of the witnesses testified were old cracks. The city's four-inch fresh-water main had been installed in 1921. The break in this pipe was several feet north of the break in the larger pipe, and was a clean, even break. Lieutenant Shade testified that when he got down into the hole when he first arrived he observed no broken pipe except the sixteen-inch salt-water main. Although there were two small blow holes in the city's pipe near the point of break, developed in the process of manufacture, there was abundant testimony that these holes would not materially affect the strength of the pipe. The termination of the city's pipe-line was on Sutro Heights Avenue, 200 feet east of the southeast corner of Forty-seventh Avenue and Sutro Heights Avenue. Several witnesses testified that the salt-water main was rusted and corroded. There was testimony that the salt water, by setting up an electrolytic process as it comes in contact with the metal, tends to weaken and soften the pipe. Several witnesses testified that the section of broken pipe had been softened to such an extent that they had been able to cut into it with a pocket-knife. The jury was taken to the plant to which the broken sixteen-inch main had been removed and inspected the pipe. There was a sharp conflict in the extensive expert testimony as to the condition and strength of the two water mains. Without reviewing the evidence in further detail, it is sufficient to say that it will sustain the conclusion that the sixteen-inch main, which had been in use for a long period of years, was in a defective condition, and that the likelihood of the existence of such condition should have been known to the salt-water company, and, further, there was evidence that the machinery maintained by the company at its pumping plant should have indicated the

break in time for the company to have shut off the water before extensive damage had been done.

The giving of the *res ipsa loquitur* instruction as to this defendant did not constitute reversible error. There was evidence from which the jury could have concluded that the city's pipe broke first, and that the Olympic Salt Water Company's pipe broke without its negligence, as a result of forces set in motion by a break in the city's pipe. However, the jury was instructed that if it found that the city's main broke first, and the salt-water company's main broke as a result of the break in the city's main, the verdict should be in favor of the Olympic Salt Water Company. The jury. found against the Olympic Salt Water Company, and it must be inferred that the Olympic main broke first. There being evidence amply sufficient to sustain a verdict of negligence against said company, we are of the view that in the circumstances of this case the judgment should not be reversed because of said *res ipsa loquitur* instruction. (*Edwards* v. *Gullick*, 213 Cal. 86 [1 Pac. (2d) 11]; *Gonzalez* v. *Nichols*, 110 Cal. App. 738 [294 Pac. 758].) We find no other errors which require a reversal.

The judgment is affirmed.

Curtis, J., Shenk, J., and Waste, C. J., concurred.

Preston, J., and Langdon, J., being disqualified, did not participate herein.

Rehearing denied.

Waste, C. J., Thompson, J., and Tyler, J., *pro tem.*, dissented.