[Civ. No. 7980. Third Dist. May 28, 1952.]

LOUIS S. LEWIS et al., Respondents, v. RAS BJORNESTAD, Appellant.

De Meo & De Meo, Charles V. Barfield and Rogers & Clark for Appellant.

Geary, Spridgen & Moskowitz and O'Hara, Randall, Castagnetto & Kilpatrick for Respondents.

VAN DYKE, J.—Louis S. Lewis and his wife Ella brought this action against Ras Bjornestad to recover damages for loss suffered by them when a fire damaged the Lakeside Dairy in Vallejo, which they owned and operated. They charged that the fire was caused by the negligence of Bjornestad. Judgment was rendered in their favor and Bjornestad appeals.

A few months prior to November 6, 1943, respondents undertook the construction of certain improvements in their dairy, which improvements included the replacement of a gas boiler, gas line and gas meter. Appellant Bjornestad contracted to install a new gas boiler. A plumber contracted to install the gas line leading from the gas pipe of the Pacific Gas and Electric Company, hereinafter called the "utility," to the boiler; and the installation, at the request of the respondents, included the insertion into the line and the capping or plugging of a "T" outlet designed at some later time to be connected with and to supply gas to a floor heater for the use of the apartment above the main dairy building. The base of the floor heater, with its pilot light, extended through the ceiling of the dairy proper. This brought the

pilot light approximately 10 feet distant from the T in the gas line, which line ran along under the ceiling of the dairy proper. When the boiler had been installed save for final testing and the gas was in, the utility installed its meter, but did not turn on the gas. On November 6th appellant appeared at the premises for the purpose of placing his boiler in operation and making his final adjustments. Since the gas had not been turned on at the meter appellant either himself called the utility or had the call placed by an employee of the respondents, with the request that the gas be turned on, this being the conceded duty of the utility. Appellant was told that the utility had at the moment no man available and did not know when one could be sent out. After waiting for some time and no one having appeared from the utility, appellant undertook to turn on the gas himself. It appears that there is a standard practice followed by the utility in doing this. The valve is opened and the test hand of the meter is watched. If the line is tight the test hand will move temporarily and for a very short period until the pressure in the line being serviced equals that in the main and thereupon the test hand becomes stationary. Thereafter a watch is kept for several minutes and if the test hand continues stationary it is considered that the tightness of the line has been demonstrated. There was testimony on the part of appellant, which he argues was uncontradicted, that, being thoroughly familiar with what had to be done in turning gas into a new line and having, with the authority of the utility, done it many times, he carefully and completely followed the prescribed routine, noted the preliminary fluctuation of the test hand when he opened the valve, and that it became stationary, indicating a tight line; and that thereupon, leaving a helper to watch the test hand further, he went to his boiler, bled the line of air until raw gas came out at the burners, then lighted the burners and began adjusting them to get maximum efficiency. It appeared that before the gas was turned on, and in compliance with law, the Vallejo inspector tested the line after it was installed and found and certified that it was tight. He removed the cap or plug from the T and affixed his pressure gauge thereto and thus used that orifice as a convenient means of testing the line. In compliance with law he thereupon hung his certificate on the meter or at the meter location which certified that the line had been tested and found tight. The certificate was there when appellant later turned on the gas. Appellant was busy

at the gas boiler for 15 or 20 minutes and there. was testimony that during that time a strong smell of gas pervaded the dairy. Then there was an explosion, followed by the fire which caused the loss for which respondents brought this action against appellant. After the fire the Vallejo fire chief inspected the premises and traced the gas line and, so tracing it, came to the T in the line and there found that the T was open. It was the theory of respondents that this T had been open when the appellant turned on the gas; that he was negligent in the manner in which he turned on the gas, and did not, as he should have done, discover that the line was leaking; that, while he was testing his boiler, gas escaped from the open T, was ignited, probably by the pilot light in the floor furnace, and that the fire and loss ensued. This theory impliedly was adopted by the trial court. It found that appellant "negligently, carelessly and recklessly turned on and/or caused to be turned on a certain gas meter, which said gas meter was connected to a gas pipe which led to a boiler located approximately thirty to forty feet distant from said gas meter, which boiler had been installed by Defendant Ras Bjornestad . . . at the instance of said Plaintiffs, . . . . That as the direct and proximate result of" appellant's "turning on such gas meter and as a result of the carelessness, negligence and recklessness of said" appellant "said distributing plant and building and said equipment . . . was burned and thereby damaged."

Appellant discusses his points in support of the appeal along the lines of the measure of the duty of a utility supplying gas to a consumer's appliances, to inspect and make sure of the safety of those appliances, citing the rule declared in *Sawyer* v. *Southern Calif. Gas Co.*, 206 Cal. 366 [274 P. 544], and declares that the evidence is uncontradicted that appellant complied fully with the measure of those duties. In this appellant is mistaken. Regardless of the measure of duty of a utility supplying gas through its appliances to the appliances of a consumer with respect to the safety of the consumer's appliances we have here a situation which is simple in the extreme. Appellant undertook to turn the gas into the respondents' appliances in order that he might finally test and regulate the gas boiler that he had installed. ■ Gas is a dangerous commodity and he who undertakes to control it must use a high degree of care to prevent its leaking. If, therefore, there was leakage and appellant failed to detect it, with the result it continued to a point where the escaping

gas became ignited and burned the property of respondents, the appellant was liable in damages for the loss. That is the simple situation portrayed by the evidence and as to whether or not he was so negligent the evidence was squarely in conflict.

■ While he and his helper, and to some extent one of the employees of respondent, testified as to what he did in the way of observing the test hand of the meter as a means of determining whether the line was tight, and by their testimony showed that he had complied with the ordinary standard of care, which we may assume was all that was required of him under the circumstances, nevertheless that testimony is contradicted by the testimony introduced by respondent that gas was observed to be leaking throughout the premises while appellant was testing his boiler; that the T was found open after the fire; that something in the nature of an explosion took place in the area in which the escaping gas had been detected; and that the fire ensued. The particular materiality of the testimony as being contradictory to that of appellant and his witnesses lies in this: If, and here assuming the meter was in fact in good working condition so that it would give notice that the line was leaking, the appellant had followed the routine of watching the test hand and the T had been open, the meter would have told him that gas was leaking. If, therefore, gas in fact was leaking, and this the trial court impliedly found to be a fact, then appellant did not properly watch the meter. If the meter failed from defect to be reliable, the fault was appellant's, for he had no right to make use of it. His assumption that it was reliable was at his risk. In the last analysis it was for the trial court to determine where the truth lay and upon this conflicting testimony, part direct and part circumstantial, it resolved the issue against the appellant, and under familiar rules that finding concludes the matter on appeal.

There was other testimony introduced by appellant tending to show that he received at the boiler burners a full flow of gas which would not have been the case had there been a leak in the line. This also did no more than create a conflict with the circumstantial evidence referred to. It was, of course, as appellant argues, not necessarily the burden of appellant to show some other source of the fire and it is, of course, possible that some other source did exist and was in fact the cause of the fire. And it is further possible, as appellant further argues, that the open T could be explained by the destruction of the plug through the heat of the fire if

a destructible plug was used, but these also are matters of conflict for resolution by the trier of fact.

 Appellant further contends that respondents were guilty of contributory negligence as a matter of law and they argue thus: The gas line to the new boiler from which the gas allegedly escaped, through the T, into the storeroom was installed by respondents and the work was at all times under their control. The T was installed at their request. They maintained the floor furnace intruding into the storeroom. They caused the utility to install the meter so as to be ready for service and asked the utility on the day of the fire to turn on the gas "without ever bothering to find out whether the connection to the gas appliances in the apartment had been completed or to even look at the T''; they advised appellant the boiler would be ready to place in operation at the end of the week. Appellant, they say, had no part in any of this except that he asked respondents to have the utility turn on the gas, and they say that, despite respondents' knowledge that the gas would be turned on, respondents did not warn appellant that the T had been installed or that the line might be open and made no effort to check the line. These facts might have furnished, and we will consider they would have furnished, support for a finding of the trial court that there was here such concurring negligence of respondents as to bar their recovery. But when that has been said, all has been said that can be said concerning the situation in appellant's favor, and not enough has been said to reverse the judgment. The trial court found against the defense and this finding must be sustained, for the trial court could have reasoned as follows: Respondents could reasonably have relied in all that they did upon the efficiency and care of those who, through contract and otherwise, became charged with the proper installation and testing of the gas line. Respondents did not authorize appellant to turn on the gas. It was the duty of the utility to make the routine test at the time it turned the gas through its meter and respondents could reasonably assume that the routine test, if properly made, would detect any opening in the gas line. They had no reason to anticipate that appellant would take it upon himself to turn on the gas without authority. If, then, the T was open and remained open by reason of the negligence of appellant in failing to discover it was open the sole proximate cause of the ensuing loss was the negligence of appellant and the fact that the T was open was not a matter chargeable, in any sense, to any negligence

on the part of respondents. If the court so reasoned, its finding that respondents were not guilty of contributory negligence finds ample support in the record.

The judgment appealed from is affirmed.

Adams, P. J., and Schottky, J. pro tem., concurred.

A petition for a rehearing was denied June 27, 1952, and appellant's petition for a hearing by the Supreme Court was denied July 24, 1952.