[L. A. No. 24696. In Bank. Dec. 17, 1957.]

AUGUSTINE AMBRIZ et al., Respondents, v. PETRO-LANE LTD. (a Corporation) et al., Appellants.

472

Spray, Gould & Bowers, Charles F. Pendleton, Walch & Griswold and Roger R. Walch for Appellants.

Bruce Walkup, Edmond A. Chevalier and Eugene L. Adams for Respondents.

CARTER, J.—Defendants, Petrolane Ltd., a corporation, Dyer Trucking Company, a corporation (hereafter referred to as Dyer), and its employee truck driver, Hanley, appeal from a judgment for damages for plaintiffs, husband and wife, for injuries suffered by them, and for the death of their three children resulting from an explosion and fire in the cabin owned and supplied by Hansen and on his premises and occupied by plaintiffs as itinerant farm laborers of Hansen.[1]

The case was tried before the court without a jury and it appears from the findings that the children were killed and the injuries were suffered by plaintiffs as the result of a fire and explosion in a cabin, one of a number of others which were maintained by Hansen for his itinerant seasonal farm employees; that a butane gas tank was located on Hansen's premises which was connected by pipes to each of the cabins to supply them with gas through outlets in the cabins. On October 3, 1953, plaintiffs, as employees of Hansen, and their children moved into one of the cabins, which had an outlet for gas protruding through its exterior wall to the inside. The gas tank had been filled at that time. The outlet in the cabin was not capped nor otherwise properly closed to prevent the escape of gas, but it had a valve on it. Before plaintiffs moved into the cabin defendants and their agents filled the gas tank but no proper inspection was made to see that the cabin outlets were not leaking. As a result of the negligence of defendants in failing to make an inspection before filling the tank, gas escaped into plaintiffs' cabin, and on October 8th, the explosion and fire occurred, proximately resulting in the death of the children and injuries to plaintiffs. It is also found "That at all times herein mentioned the butane gas which was sold and distributed by defendants was extremely dangerous and highly explosive; that at all times herein mentioned the defendants, and each of the[m], were engaged in an ultrahazardous activity and business; that the sale and distribution of such butane gas is an inherently and intrinsically dangerous activity and business; that the defendant PETROLANE LTD., a corporation, as well as the other defendants, was under a duty to use care commensurate with the danger in the conduct of such activity and business, and such duty of said

___

[1] A settlement was made with Hansen in a separate action against him which was dismissed when plaintiffs gave a covenant not to sue.

defendant could not be delegated to any other person'';[2] and that plaintiffs were not contributively negligent. Judgment awarding damages to plaintiffs was accordingly entered.

Defendant Petrolane contends that it was under no duty of care to inspect the cabin outlets for the gas because it is not a public utility, and even if it were, it was not its duty to inspect; that any conduct by it was not the proximate cause of the explosion; that there was no absolute liability (as seen below this question need not be discussed); that the evidence does not support the judgment.

Viewing the evidence most favorable to the judgment, as we must, it shows that Hansen owned and maintained on his farm some 30 cabins to house itinerant farm workers during the cotton picking season. A 600-gallon butane gas tank with a valve was maintained in connection with the cabins from which pipes ran to each of the cabins. When the valve at the tank was opened the gas would flow to and into the pipes in all of the cabins. The gas line extended through the back wall near one corner of plaintiffs' cabin for about a foot inside the cabin and 12 to 18 inches above the floor. It was designed to have a hose or other type of connection with it and a gas burning appliance. The butane system had been in use on the farm for about five years prior to the accident. The end of the pipe in the cabin was not capped; there was a valve there that required a wrench to operate. Expert testimony showed that the valves were not sufficient to prevent leaks of gas and not designed or proper for gas valves; that the pipes should be closed with caps or plugs to prevent leakage; that when the valve is turned off or on it is likely to become leaky; that its closure surface consists of metal against metal which may be lubricated with grease which is solvent by liquid petroleum gas; that it was of the type which becomes more likely to leak as it becomes older. Butane is a heavy invisible gas with an odor resembling rotten eggs and highly explosive from an open flame or anything which gives off sparks. The time required for leaking gas to build up to explosive pressure

[2]There is some discussion by defendants as to whether this was a finding of absolute liability (see *Luthringer* v. *Moore*, 31 Cal.2d 489 [190 P.2d 1]) and outside the issues but plaintiffs do not rely on strict liability as a basis for their judgment. Hence even if it is outside the issues and is a finding on that theory and such theory is mentioned in the trial court's opinion it is unimportant for there were also findings of defendants' negligence above mentioned and basing liability thereon.

depends on the extent of the ventilation of the room and size of leak; it might take a week to build up after the leaking into a cabin started when the tank had been empty for six months or so and the tank then filled and there was a slow leak. Here the explosion occurred 12 days after the empty tank was filled and prior thereto the cabin had been open. A person may become accustomed to its odor and not notice it; a layman might not know what the odor was.

Petrolane is a seller of butane and had been selling it to Hansen for his tank for several years and had it delivered by Dyer who used its employee, Hanley. The delivery and filling of the tank in question was done on September 26, 1953, and was the first since the last cotton picking season several months before. Petrolane's district manager, Herman, had examined the gas system at Hansen's ranch including the cabin valves in 1951, or 1952. The same kind of valves were there as at the time of the explosion, and there were no caps on the pipes. He was well versed in the characteristics, propensities and use of the gas. So was Hanley. When he made his inspection Herman found leaks in the valves in some of the cabins of which he informed a Hansen employee. No inspection was made of the valves or for leaks when the tank was filled on this occasion. Herman and Hanley also knew the camp housed itinerant farm workers and Herman knew the gas would flow from the tank to the cabins and would escape if there were any leaks and the delivery in question was the first of the season. Hanley knew there had been no gas in the tank for months. A simple test may be made for leaks by soapy water, or a pressure gauge is customarily used before gas is put into a tank and may be placed without entering the cabins. Air is pumped into the pipe lines and if the pressure drops, a leak is indicated. In fact there is evidence that the pressure gauge test is always used when an empty tank is filled. Herman knew of those tests. Herman gave no instructions to Hanley as to anything in connection with the delivery of the gas or filling the tank but he knew the tank had been empty for several months. Generally the outlet valve at the tank is closed when the tank is filled. The tank and butane system are owned by Hansen.

Plaintiffs were employed by Hansen and assigned the cabin in question. Mr. Ambriz was 34 and his wife 29 years of age; they had three children, the oldest being 7 years of age. The cabin was unfurnished, had electricity but no toilet or water facilities except outside. They moved into the cabin

on October 3, 1953. They brought a kerosene stove with them for cooking which glowed a while after being turned off. They slept on mattresses on the floor. They did not know gas was piped to the cabin nor the purpose of the gas pipe protruding into the cabin and did not touch it. They had never used gas for fuel and knew nothing of butane or its odor. The cabin was filthy and had a foul odor, probably from vomiting and urine or gas, and plaintiffs were unable to dispel the odor even though they cleaned it. They had kept the cabin well ventilated until the day of the explosion, October 8, 1953. Plaintiffs were bothered by an unusual amount of flies that day, many of which gathered near the gas pipe. (There is evidence that butane attracts flies; their presence is an indication of a leak.) Mr. Ambriz and his son were inside the cabin during the day and got headaches which may be caused by the gas; the others were outside and did not. The windows and door were closed that night and the odor more foul than ever. They cooked their dinner on the kerosene stove, turned it off and went to bed. It continued to glow for some time as was its characteristic. About 10 minutes later the explosion occurred.

While there is a conflict in the evidence, the resolution thereof was for the trial court. While there is evidence that the valve in plaintiffs' cabin was partly open after the explosion and they had a wrench which would fit the valve, the opening might have been caused by the explosion and plaintiff Ambriz testified he had the wrench and used it only for protection from marauders and had not touched the valve. Assuming that there was a duty of care on the part of Petrolane, there is ample evidence in the record as above outlined and otherwise, either direct or by inference, that Petrolane was negligent and that negligence caused the explosion in that, knowing what it did, it took no steps to prevent the occurrence.

It is clear that butane gas, like natural gas or electricity, is an inherently and highly dangerous commodity. In view of the inherently dangerous nature of this commodity a high degree of care is required in handling it. (See *Signorelli* v. *Potter*, 43 Cal.2d 541 [275 P.2d 449]; *Cucinella* v. *Weston Biscuit Co.*, 42 Cal.2d 71 [265 P.2d 513]; *Beresford* v. *Pacific Gas & Elec. Co.*, 45 Cal.2d 738 [290 P.2d 498]; *Snyder* v. *Southern Calif. Edison Co.*, 44 Cal.2d 793 [285 P.2d 912]; *Austin* v. *Riverside Portland Cement Co.*, 44 Cal.2d 225 [282 P.2d 69].) Here the tank, pipes from

the tank and the valves on the pipes in the cabins belonged to Hansen. ■ In such cases it may be assumed that "As a rule, a gas company which does not install or own the pipes in a customer's premises, and which has no control over them, is in no way responsible for the condition in which they are maintained, and consequently is not liable for injuries caused by a leak therein *of which it has no knowledge.*" (Emphasis added; 26 A.L.R.2d 136, 156.) And "Generally speaking, however, a gas company which does not install pipes in a customer's building, and which has no control over them, is in no way responsible for the condition in which they are maintained and, consequently, is not liable for injuries caused by a leak therein *of which it has no knowledge.* The company is warranted in assuming that the interior system of pipes is sufficiently secure to permit the gas to be introduced with safety. However circumstances may be such as to require an inspection of pipes on private property before turning gas into them. . . .

■ "If a gas company knows, at the time it turns on the gas, or, after turning on the gas, becomes aware, that there are defects in the pipes, or if the company is in possession of facts that would suggest to a person of ordinary care and prudence that the pipes in the building are leaking or are otherwise unsafe for the transportation of gas, the company is under a duty to make such an inspection or investigation as a person of ordinary care and prudence, similarly situated and handling such dangerous agency, would make to ascertain the safety of the pipes, before it furnishes or continues to furnish gas through them. If the gas company fails to do this and furnishes or continues to furnish gas through the pipes, it does so at its own risk and becomes liable for an injury resulting therefrom to any person in the building who is without fault. ■ Similarly, a gas company knowing that the service line, which it is under no duty to repair or maintain, is rusted and corroded to such an extent as to permit gas to escape must cause the line to be repaired by the person whose duty it is to do so or must shut off the gas at the street." (Emphasis added; 24 Am. Jur., Gas Companies, § 32.) (See, 25 A.L.R. 271; 29 *id.* 1252; 47 *id.* 849; 90 *id.* 1086; 138 *id.* 870; *Ray* v. *Pacific Gas & Electric Co.,* 3 Cal.App.2d 329 [39 P.2d 812].) ■ Thus ownership of the pipes or appliances is not an indispensable requisite to liability of a gas company. Where the company knows the customer's line is defective—has leaks—it must

take precautions according to the circumstances. (See *Scarborough* v. *Central Arizona Light & Power Co.,* 58 Ariz. 51 [117 P.2d 487, 138 A.L.R. 866] ; *Heller* v. *Equitable Gas Co.,* 333 Pa. 433 [3 A.2d 343] ; *Boyce* v. *Northern Utilities Co.,* 75 Wyo. 500 [297 P.2d 820] ; *Baker* v. *Kansas Power & Light Co.,* 146 Kan. 258 [69 P.2d 731] ; *Southern Indiana Gas Co.* v. *Tyner,* 49 Ind.App. 475 [97 N.E. 580] ; *Gerdes* v. *Pacific Gas & Electric Co.,* 219 Cal. 459 [27 P.2d 365, 90 A.L.R. 1071] ; *Bell* v. *Brooklyn Union Gas Co.,* 193 App. Div. 669 [184 N.Y.S. 807] ; *Stephany* v. *Equitable Gas Co.,* 347 Pa. 110 [31 A.2d 523] ; 26 A.L.R.2d 136 ; 138 A.L.R. 870.)

█ Furthermore when gas is first turned on by a gas company (here it was in effect the same as it was the first delivery of the season there having been no use of the gas since the last season), it must exercise care as to the condition of the property owner's own pipes and connections. While distinguishable on its facts this court said in *Sawyer* v. *Southern Calif. Gas Co.,* 206 Cal. 366, 371 [274 P. 544] : "It is not in all cases a sufficient answer to a claim of liability against a gas company that the cause of the escape and explosion of gas is to be found in the condition of the house pipes, which the gas company does not own or control. There are well-considered cases . . . to the effect that a gas company may be liable where it either directs its employees to turn on a gas-meter, or authorizes the person applying for gas to turn it on, and an explosion occurs by reason of an escape of gas through a house pipe connected with the meter which was uncapped or severed at the time the meter was turned on. . . .

"While it is generally held that there is no duty on the part of a gas company to inspect house pipes after service has once been established, and consequently no liability for injuries resulting from an escape of gas through house pipes which become defective in the absence of notice of a leak in the house pipes . . . it does not follow that a gas company may turn on meters through which gas passes into uncapped house pipes without incurring liability for injuries to persons or property caused thereby, even though it has been ordered by an occupant of the building to turn on the gas supply. Gas companies, as manufacturers and distributors of a highly explosive and inflammable substance, possess technical knowledge of the dangers to be guarded against in handling or installing gas appliances for illuminating and commercial purposes far beyond the knowledge possessed by

the average person. It would appear to be the duty of a gas company to make some inquiry or investigation to satisfy itself that all openings in the house pipes are closed at the time it turns on its meters." (See *Lewis* v. *Bjornestad*, 111 Cal.App.2d 409 [244 P.2d 497].)

Taking all the circumstances together, including the insufficiency of the valves, the dangerous nature of the gas, the knowledge of Petrolane and that it gave no instructions to Hanley or Dyer, that the tank was filled for the first time during the year and other factors above mentioned, it follows that the trial court could, as it did, conclude that Petrolane had a duty of care which it breached, which was the proximate cause of the accident and was, therefore, liable for the injuries suffered by plaintiffs.

Petrolane contends that the gas should have been discovered if there was a leak, when the delivery was on September 26th and the explosion on October 8th, and hence a leak was not the cause of the explosion, but we have the open condition of the cabin prior to the explosion, the expert testimony as to pressure building up, and the closed condition of the cabin at the time of the explosion. The trier of fact was justified in finding causation. Complaint is also made of the court's failure to specially find that Petrolane had notice of the leaky condition but such finding was embraced within and included as an element in the general finding of negligence. Nor is there merit to Petrolane's contention that it had no notice of the leaky condition of the valves. It made an inspection which the court could find was in 1952 and found such condition. Moreover, as an expert in the propensities of liquid petroleum, it should have known that the cabin valves were insufficient as shown by the expert testimony. Likewise there is evidence to show no contributory negligence. Similarly it cannot be said as a matter of law that Hansen would repair or replace the valves and Petrolane could rely thereon; in view of the facts and law above stated the trier of fact could decide that Petrolane could not make that assumption. All of these matters were questions which were decided by the finder of fact, the trial court. (See *Warner* v. *Santa Catalina Island Co.*, 44 Cal.2d 310 [282 P.2d 12].)

There is no valid distinction between Petrolane's activities and a company supplying gas through its pipes in a city as suggested by Petrolane as far as the care required is

concerned. (See *Koch* v. *Southern Cities Distributing Co.,* 18 La.App. 664 [138 So. 178]; 17 A.L.R.2d 888.) In both situations they are delivering and selling to a consumer a dangerous gas, one by truck which fills a customer's tank and the other by its pipes which run from a central system to the customer's premises. As said in *Signorelli* v. *Potter, supra,* 43 Cal.2d 541, 543, a liquified petroleum gas is "inflammable, explosive, and highly volatile. Those who control it must *use* the *utmost care* to prevent its escaping." We are not here concerned with any rules and regulations for gas company utilities.

Cases such as *Loos* v. *Mountain Fuel Supply Co.,* 99 Utah 496 [108 P.2d 254], *Feder* v. *Illinois Power Co.,* 3 Ill. App. 319 [122 N.E.2d 53], *Wright* v. *Southern Counties Gas Co.,* 102 Cal.App. 656 [283 P. 823], and *Ray* v. *Pacific Gas & Electric Co., supra,* 3 Cal.App.2d 329, relied upon by Petrolane, did not involve facts such as we have here.

█ It is suggested that Dyer was an independent contractor for Petrolane to deliver the gas to Hansen and hence insulated Petrolane from liability. We cannot agree. There is the additional factor that Petrolane failed to give any information or instructions to Dyer or his driver employee, Hanley, and Petrolane could not escape liability by hiring an independent contractor to make the delivery. In *Community Gas Co.* v. *Williams,* 87 Ga.App. 68 [73 S.E.2d 119], the seller of propane gas in tanks filled an order for a tank of gas to be delivered to plaintiff by use of an independent contractor to make the delivery. Through negligence of the contractor the tank exploded at plaintiff's residence when being unloaded. The court held the seller liable as it could not delegate its duties with respect to the gas because of the inherently dangerous character of the gas. Although there was a statute involved, the case was also decided on the common law. This is the law in this state; we stated in *Snyder* v. *Southern Calif. Edison Co.,* 44 Cal.2d 793, 800 [285 P.2d 912], quoting from Harper, Law of Torts, section 292, that while in some cases an independent contractor relationship insulates the employer there are many exceptions such as " 'Another large group of cases predicate liability on the part of the employer of an independent contractor for the misconduct of the latter in the performance of certain "intrinsically dangerous" work. The policy of allocating to the general

entrepreneur the risks incident to his activity is obvious when the activity carries with it extraordinary hazards to third persons. . . . [T]he principle may be generalized that one who employs an independent contractor to perform work which is either extra-hazardous unless special precautions are taken or which is inherently dangerous in any event is liable for negligence on the part of the independent contractor or his servants in the improper performance of the work or for their negligent failure to take the necessary precautions. This broad principle has been applied not only to excavations on private property, but on the public highway as well, to blasting operations, to the construction of a dam, to the use of fire in clearing land, to the demolition of walls and old buildings, and to several other types of intrinsically dangerous enterprises. . . .' " It is said: "If an attempt must be made to generalize, it may be said that when the defendant is under a duty to act reasonably for the protection of the plaintiff, and may anticipate that a third person may fail to use proper care if the responsibility is transferred to him, and that serious harm will follow if he does not, it is not reasonable care to place reliance upon him." (Prosser, Law of Torts (2d ed.), p. 144.) We have here the other above mentioned factor, the failure of Petrolane to give any instructions or communicate its knowledge about Hansen's gas system to the contractor, Dyer, or its employee, Hanley. This, together with the inherently dangerous character of the activity, points to a situation where Petrolane could not escape liability by making Dyer its independent contractor. (See *Texas Electric Service Co.* v. *Holt,* (Tex.Civ.App.) 249 S.W. 2d 662.)

 In regard to defendants Dyer and Hanley it appears, in addition to what has already been said, that they both were familiar with the gas involved and its characteristics and had been delivering it for several years. Dyer never instructed his drivers to check with Hansen or his employees on making a delivery. They knew the delivery was the first of the season and none had been delivered for several months. Dyer said if he had had any knowledge the gas system leaked he would have at least shut off the tank. valve at the tank, thus preventing the gas from flowing into the system. Hanley took no precautions whatever. He could have told Hansen of the delivery and could have taken such other precautions as would have been commensurate with the exercise of due care. They knew of the pressure test. Under the circumstances

the court was justified in finding them guilty of negligence which was a proximate cause of the accident. (*Sawyer* v. *Southern Calif. Gas Co., supra,* 206 Cal. 366.)

The judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

Schauer, J., and McComb, J., concurred in the judgment.

Appellants' petitions for a rehearing were denied January 15, 1958.